# IN THE SUPREME COURT OF TEXAS

══════════

No. 16-0505

══════════

MURPHY EXPLORATION & PRODUCTION COMPANY—USA,
A DELAWARE CORPORATION, PETITIONER,

v.

SHIRLEY ADAMS, CHARLENE BURGESS, WILLIE MAE HERBST JASIK,
WILLIAM ALBERT HERBST, HELEN HERBST, AND
R. MAY OIL & GAS COMPANY, LTD., RESPONDENTS

══════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

══════════════════════════════════

JUSTICE JOHNSON, joined by JUSTICE GREEN, JUSTICE GUZMAN, and JUSTICE BOYD, dissenting.

This case is about what the parties to contracts—mineral leases—agreed to. It is not about where the perforated portions of horizontal wells are, or engineering distinctions between vertical wells and horizontal wells, or the drainage characteristics of the Eagle Ford Shale formation. There is no indication that such finer points of oil and gas production were within the contemplation of the two sides that negotiated and executed the leases before us. The only evidence outside of the leases themselves that addresses the intent of the parties is the depositions of the Herbsts. The Court sidesteps that evidence by deciding the leases are unambiguous and construing the word "offset" in them as a matter of law. And that is important, because, as discussed below, the depositions indicate that the Herbsts were not negotiating the leases on the basis of engineering or geological principles.

They were negotiating on the basis that they wanted their minerals protected from even the possibility of being poached by means of *any* type of well on adjacent property—whether vertical or horizontal. Nevertheless, the Court discusses subjects such as the direction of horizontal well laterals and whether they run parallel or perpendicular to lease lines, perforations of wells, and geological characteristics of the Eagle Ford Shale. It does so in trying to explain on behalf of Murphy why the parties who were involved in negotiating and executing the leases—one of whom was not Murphy—could not have intended for the phrase "offset well" as used in the leases to mean precisely what it meant for decades before, and at the time of, the leases' executions.

The Court's construction of the leases and discussions of drainage characteristics of the Eagle Ford Shale are, to a significant degree, based on treatises written years after the leases were executed. The Court also focuses on the fact that the well triggering Murphy's requirement to drill an offset well was producing from the Eagle Ford Shale and that wells producing from that formation are horizontal wells. The Court discounts the fact that the leases are not limited to the Eagle Ford Shale, but instead encompass all the minerals under the lease acreage, and that the leases do not limit themselves to horizontal wells, but instead also specifically contemplate and reference vertical wells.

In construing the offset well provisions of the leases, the Court says that (1) the entire lease must be considered in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless, and (2) the lease is to be construed in light of the circumstances present when it was entered into. *Ante* at __. I agree. But the Court fails to adhere to those principles in reaching its decision. I respectfully dissent.

2

# I. Background

The oil and gas leases (Leases) that Alvin M. Barrett & Associates, Inc. (Barrett), the predecessor-in-interest of Murphy Exploration and Production Company, entered into with Shirley Mae Herbst Adams and William Albert Herbst (collectively, the Herbsts[1]) each contain the following paragraph:

> 25.) It is hereby specifically agreed and stipulated that in the event a well is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease, that Lessee herein is hereby obligated to, within 120 days after the completion date of the well or wells on the adjacent acreage, as follows:
>
> (1) to commence drilling operations on the leased acreage and thereafter continue the drilling of such off-set well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from on the adjacent acreage; or
>
> (2) pay the Lessor royalties as provided for in this lease as if an equivalent amount of production of oil and/or gas were being obtained from the off-set location on these leased premises as that which is being produced from the adjacent well or wells; or
>
> (3) release an amount of acreage sufficient to constitute a spacing unit equivalent in size to the spacing unit that would be allocated under this lease to such well or wells on the adjacent lands, as to the zones or strata producing in such adjacent well.

As the Court notes, the parties do not dispute that the Lucas A #1H horizontal well (Lucas, or Lucas well) was completed in the Eagle Ford Shale formation on a tract "adjacent and contiguous" to the leased premises and is "a producer of oil and/or gas." The parties agree that the

---

[1] Charlene Burgess, Willie Mae Herbst Jasik, Helen Herbst, and R. May Oil & Gas Company, Ltd. were also parties to the suit and are parties to the appeal.

Lucas well triggered Murphy's obligations under the offset[2] well clause. Murphy claims that it complied with the clause by drilling the Herbst Unit B1H well (Herbst, or Herbst well), a horizontal well whose lateral runs approximately parallel to that of the Lucas's lateral but over 2,000 feet from it. In the trial court and court of appeals, the Herbsts maintained that the Leases unambiguously required Murphy to locate an offset well as close as reasonably possible or as close as regulations permit to the triggering well and that as a matter of law, the Herbst did not fulfill this requirement. The court of appeals held that Murphy failed to prove as a matter of law that the Herbst met the requirements of the offset clause, so Murphy was not entitled to summary judgment. 497 S.W.3d 510, 516–17 (Tex. App.—San Antonio 2016). The court concluded that an offset well protects against drainage, meaning Murphy's summary judgment burden was to conclusively prove that the Herbst was protecting from drainage by the Lucas. *Id.* at 516. Because Murphy did not do so, it was not entitled to summary judgment. Here, the Herbsts seek only to have the judgment of the court of appeals affirmed. For the reasons expressed below, which differ somewhat from those of the court of appeals, I would do so.

## II. Standard of Review and Law

Mineral leases are contracts and are interpreted using the same rules that are applied in interpreting contracts. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). Thus, in construing an oil and gas lease, our task is to "seek the intention of the parties as that intention is expressed in the lease." *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 727–28 (Tex. 1981); *see also Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011).

---

[2] The Leases use "off-set." I will use the more common "offset."

4

Summary judgment as to a contract interpretation issue is proper only if the parties' intent, as expressed in the language of the contract, has been conclusively established. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

If a contract contains an ambiguity, "the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). If "the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). "Whether a contract is ambiguous is a question of law, subject to de novo review." *Bowden v. Phillips Petroleum Co.*, 247 S.W.3d 690, 705 (Tex. 2008). A contract may be ambiguous even though the parties agree it is not because ambiguity is a question of law for courts to decide. *Progressive Cty. Mut. Ins. Co. v. Kelley*, 284 S.W.3d 805, 808 (Tex. 2009). In determining whether a contract is ambiguous, the contract is to be examined as a whole in light of the circumstances present when it was entered into. *Nat'l Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995); *see also First Bank v. Brumitt*, 519 S.W.3d 95, 109–10 (Tex. 2017) (explaining that courts may consider the context in which an agreement was made in determining whether it is ambiguous). As part of this inquiry, the entire writing is to be considered in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (quoting *Coker*, 650 S.W.2d at 393). Further, terms are to be considered as having been given "their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or different sense." *Heritage Res., Inc. v.*

5

*NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). When considering motions for summary judgment, courts are to indulge every reasonable inference and resolve any doubts in favor of the nonmovant. *Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 449 (Tex. 2015).

### III. Discussion
### A. Language of the Leases

As with any contract, the Leases must be read according to the language the parties used, without adding to or taking away from it. *Heritage Res., Inc.*, 939 S.W.2d at 121 ("We presume that the parties to a contract intend every clause to have some effect. We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used them in a technical or difference sense." (citations omitted)). The Leases were executed in 2009, and Murphy—an entity that does not claim to have been part of or have had any connection with the lease negotiations—argued in the lower courts and continues to argue here that the offset well provision was drafted with horizontal wells in mind. Without further explication, the Court slips past the lack of evidence of that position by saying that the Herbsts "[do] not dispute that [the Leases] were drafted with horizontal shale drilling in mind." *Ante* at __. The Court recognizes the proximity requirement associated with the traditional definition of offset well and states, without respect to the fact that the Leases must be construed as intended by the Herbsts and Barrett, who negotiated them, that "[t]his is a reasonable premise in the context of vertical drilling, where placement of an offset well is an important factor in minimizing the amount of oil or gas being drained. But the same principle does not apply in the context of horizontal drilling and hydraulic fracturing in the Eagle Ford Shale." *Ante* at __ (citation omitted).

6

There are two problems with the Court's position. First, the Court simply decides—without any indication in the Leases—that the Leases must have been based on what the *Court* decides would have been a "reasonable premise" or principle, without regard to what the Herbsts and Barrett actually intended when they entered into the Leases. Second, the Court badly shortchanges the Herbsts' position. The Herbsts point out that the Leases expressly contemplate both vertical and horizontal drilling, impose the offset well obligation regardless of the type of well involved, and authorize no special treatment with respect to either type of well. That is unquestionably the situation. For example, paragraph 23.) of the Leases has two subparagraphs. One is entitled and references "Vertical Wells," while the other is entitled and references "Horizontal Wells." Thus, the offset well provision must be interpreted in light of the parties' intent, as expressed in the Leases, that the Leases encompass and address all types of wells, not just horizontal wells. Moreover, as amicus curiae Texas Land and Mineral Owners Association (TLMOA) observes and the Court fails to acknowledge, the Leases grant Murphy the right to produce *all* minerals under the Herbsts' land, not just those found in the Eagle Ford Shale. According to the affidavit of Murphy's expert John C. McBeath, the Eagle Ford Shale "lies directly below the Austin Chalk formation and has long been recognized as the hydrocarbon source rock for the Austin Chalk," and lies directly above the Buda Limestone formation. The Leases thus entitle Murphy to produce from either of those two formations if they lie under the Herbsts' land, which has not been established either way.

Although the Court expressly limits its holding to "shale plays and hydraulic fracturing from horizontal wellbores," *Ante* at __, the Court's reasoning implies that had the Lucas been a vertical well drilled into the Austin Chalk, for example, and had Anadarko drilled a vertical well into the

7

same formation and location as the Herbst well, then the Herbst would not be an offset well under the offset clause. *Ante* at __. But the offset clause makes no distinction between wells drilled into any particular formation, nor does it treat vertical or horizontal wells in a disparate manner. There is no indication in the Leases that the Herbsts and Barrett, who negotiated them, intended the clause to mean one thing for vertical wells and another for horizontal wells.

The Court similarly errs in considering the proximity factor of an offset well in the context of horizontal drilling and hydraulic fracturing. The Court suggests that in horizontal drilling, the only locations that matter are the locations of the perforated and fractured portions of the horizontal wellbore. *Ante* at __. According to the Court, horizontal wells only drain from the perforated portions, so although a horizontal well's surface location may be within the offset distance, its perforations may not be. *Ante* at __. The Court provides a hypothetical in which a horizontal well runs perpendicular to the lease line, not parallel to it, meaning protecting against drainage caused by the well would be a "logical impossibility." *Ante* at __. The Court thus concludes that if the parties intended protection against drainage, the provision would have "included requirements regarding the direction and placement of the perforated portions of the horizontal wellbore." *Ante* at __. This may have perhaps been a better way to draft the offset well requirement, but it is not what the parties to the Leases agreed. If the Herbsts and Barrett had been experts in drilling wells and the various aspects of horizontal wells, as Murphy apparently is, they may have drafted the Leases differently. But there is no evidence in the record about Barrett, even if the Court would consider it, and the only evidence about the Herbsts is in their depositions, which the Court avoids considering by interpreting the Leases as a matter of law. So the Court's entire discussion is neither

8

linked to language of the Leases, nor any evidence in this record—even if the Court could consider evidence, given its position that the Leases must be construed as a matter of law. Beyond that, its hypothetical brings into this case information that the record does not show was a consideration for either the Herbsts or Barrett in their negotiating and executing the Leases.

This case is about what the parties agreed to, not what a court can suggest in hindsight that they should or could have agreed to. The Herbsts and Barrett included the term offset well in relation to any and all wells covered by the Leases—both vertical and horizontal wells drilled into the Eagle Ford Shale or any other formation.

The Leases must be read without adding to or taking away from their language absent some necessity to do so to avoid an irreconcilable conflict. *See Heritage Res., Inc.*, 939 S.W.2d at 121; *see also U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23–24 (Tex. 2015) ("An interpretation that gives each word meaning is preferable to one that renders one surplusage."). The Court states, "While the leases do not provide a formal definition of the term 'offset well,' the phrase is nevertheless internally defined by the leases' description of where and to what depth the offset well must be drilled. And these requirements qualify such a well as one that 'serves to counterbalance or to compensate for' a triggering well on the adjacent property." *Ante* at __ (footnote omitted) (citing *Offset*, WEBSTER'S THIRD INT'L DICTIONARY 1567 (2002)). But that interpretation reads the word offset out of the Leases even though offset and its generally accepted meaning in the industry when the Leases were executed does not conflict with any other part of the Leases, much less irreconcilably conflict. Under the Court's interpretation, what the parties and the

9

Court refer to as an offset provision imposes no more obligations on the lessee than would the same

Leases without the word offset:

> 25.) It is hereby specifically agreed and stipulated that in the event a well is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease, that Lessee herein is hereby obligated to, within 120 days after the completion date of the well or wells on the adjacent acreage, as follows:
>
> > (1) to commence drilling operations on the leased acreage and thereafter continue the drilling of such ~~off-set~~ well or wells with due diligence to a depth adequate to test the same formation from which the well or wells are producing from on the adjacent acreage; or
> >
> > (2) pay the Lessor royalties as provided for in this lease as if an equivalent amount of production of oil and/or gas were being obtained from the ~~off-set~~ location on these leased premises as that which is being produced from the adjacent well or wells; or
> >
> > (3) release an amount of acreage sufficient to constitute a spacing unit equivalent in size to the spacing unit that would be allocated under this lease to such well or wells on the adjacent lands, as to the zones or strata producing in such adjacent well.

Omitting the word offset makes the Leases read as Murphy contends they do, and as the Court decides they do: if the offset provision is triggered, Murphy simply had to drill a well anywhere on the Leases to the appropriate depth. Murphy argues that paragraph 25.)(1) would have said "direct offset" if the parties intended it to require wells to be drilled close to wells completed on adjacent lands. But the Leases make perfect sense as they are written without, in hindsight and in the context of litigation, adding the word "direct." Thus, offset as used in paragraph 25.), and which appears nowhere else in the Leases, unquestionably was intended to mean something.

The Court's treatment of the word offset in the Leases ignores the consistent, longstanding industry use of the word in regard to wells, as is noted below. *See URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 768 (Tex. 2018) ("[T]rade usage can illuminate the meaning of contract language because 'the meaning to which a certain term or phrase is most reasonably susceptible is the one which [is] so regularly observed in place, vocation, trade or industry so "*as to justify an expectation that it will be observed with respect to a particular agreement.*"'" (emphasis added) (quoting *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 521 n.6)). Nor does the Court's treatment of the phrase offset well as an internally defined term that does not import any of the phrase's well-established meaning in the industry account for the term's use by these parties. Similarly, Murphy's calling paragraph 25.) a "free well" clause and treating offset as only a meaningless label does not account for the use of the word in the context of the oil and gas industry and the world of mineral leases.

Under the interpretations of paragraph 25.) advanced by both the Herbsts and Murphy, the Herbsts were entitled to have a well drilled on the Herbsts' land. The question is where. To answer this question, the court of appeals turned to the industry meaning of offset well in addition to looking to case law. It concluded that the Leases unambiguously imposed an obligation on Murphy to protect the Herbsts' land from drainage, and because Murphy failed to prove conclusively it had done so, the court of appeals reversed the trial court's judgment. Murphy argues that both the Herbsts' and the court of appeals' positions render other language in the Leases surplusage. That is, if offset well means a well drilled within a reasonable distance from the triggering well on adjacent land as a counterbalance to the triggering well and its drainage, then there was no need to specify in the lease that the offset well was to be drilled "with due diligence to a depth adequate to

11

test the same formation [as the triggering well]." But as amicus curiae TLMOA points out, the language Murphy calls surplusage actually is not. It serves to re-incorporate a portion of the reasonably prudent operator standard of the implied covenant to protect the lease by protecting from drainage in light of the express offset well requirement in the Leases. *See Magnolia Petroleum Co. v. Page*, 141 S.W.2d 691, 693 (Tex. Civ. App.—San Antonio 1940, writ ref'd).

Murphy's response to TLMOA's argument is that if the term offset well imposes an obligation to protect against drainage (as the court of appeals held and the Herbsts imply), it would be "facially absurd" if a well "shoddily drilled in a different formation" could satisfy the lessee's obligations. However, Murphy also argues that an express offset well provision supersedes and supplants the implied covenant to protect against drainage, which includes the reasonably prudent operator standard. I do not completely disagree. But if an express clause supersedes the reasonably prudent operator standard, then it would necessitate lessors specifying *how* an offset well must be drilled, which is a subject separate and apart from *what* an offset well is. If lessors failed to do so, there would be nothing (i.e., the reasonably prudent operator standard) to prevent "facially absurd" results. But expressly incorporating the entire reasonably prudent operator standard anywhere in the clause could have brought with it the elements of a cause of action for the breach of the implied covenant. *See Mzyk v. Murphy Expl. & Prod. Co.-USA*, No. 04-15-00677-CV, 2017 WL 2797479, at *4 (Tex. App.—San Antonio June 28, 2017, no pet.) (holding that an offset clause that included a "deemed drainage provision" but also later incorporated the reasonably prudent operator standard required the lessor to prove the triggering well was causing drainage). So, as TLMOA points out, the Leases instead include only portions of the implied covenant. Furthermore, even if Murphy were

12

correct that courts would not allow "facially absurd" results, it was not unreasonable for the Herbsts to hedge their bets by including the language in the Leases to avoid the potential for litigation regarding the adequacy of the manner in which the offset well was drilled. Murphy's argument thus ignores the reason for the offset well provision.

The Court also fails to account for another portion of the offset well clause supporting the notion that use of the word offset imposes a proximity requirement. When the clause was triggered, Murphy had three options, one of which was to

> pay the Lessor royalties as provided for in this lease as if an equivalent amount of production of oil and/or gas were being obtained *from the off-set location on these leased premises* as that which is being produced from the adjacent well or wells.

(Emphasis added). That the clause references "the off-set location" suggests that the parties did not intend for an offset well to be drilled in a random location. Instead, the parties appear to have contemplated a particular location. Given the commonly understood meaning of offset well as discussed below, that location was certainly not where Murphy drilled the Herbst well, which was almost as far from the triggering well as possible.

The question remains, "Where?" And the answer must be, "In a location that a reasonably prudent operator would consider sufficient to protect from potential drainage." Otherwise, the word offset in the provision has no meaning. And while the lease requirement that the offset well be drilled to a depth adequate to test the formation from which the triggering well is producing might seem to be surplusage under that interpretation, if the choice regarding interpreting these Leases is between jettisoning decades of the industry's usage as to what offset well means, or accepting the

13

requirement of drilling to a depth adequate to test the formation being produced by the triggering well as being surplusage, the better choice by far is the latter.

Murphy argues, and the Court apparently agrees, that by reading offset to impose an obligation to protect against drainage, the Hersbsts and the court of appeals are augmenting the Leases by adding to them. *Ante* at __ ("[W]here the lease 'expressly defines the duty, we will not impose a more stringent obligation unless it is clear that the parties intended to [do so].'" (quoting *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011))). Accepting Murphy's argument, the Court concludes that the clause's only requirements for an offset well are that it be drilled "on the lease acreage" and "to a depth adequate to test the same formation" from which the triggering well was producing. *Ante* at __. According to the Court, the clause is silent with respect to any duty to protect against drainage or a proximity requirement; thus, the imposition of any such obligations would be altering the terms of the Leases. I disagree. But as discussed elsewhere, courts as well as the oil and gas industry have long understood the term offset well to mean a well that protects from either actual or potential drainage. And we would not be adding language to the Leases by treating the term as meaning what it so plainly meant in 2009, when the Leases were executed, and had meant long before then in the context of oil and gas leases.

Thus, Murphy's interpretation either reads words out of the Leases, renders provisions surplusage, or adds to their language; the Herbsts' does not, except for the possibility noted just above. I would reject Murphy's interpretation as unreasonable. *See U.S. Metals, Inc.*, 490 S.W.3d at 23–24 ("An interpretation that gives each word meaning is preferable to one that renders one surplusage."); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) ("[In determining

14

whether a contract is ambiguous,] we must examine and consider the entire writing in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless."); *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003) ("[W]e must give effect to all contractual provisions so that none will be rendered meaningless.").

### B. Context of Execution of the Leases

In interpreting the Leases, we may consider the circumstances present in August 2009, when they were executed. *See Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520. Those circumstances include the meaning commonly applied by the industry and courts to offset well language prior to and contemporaneously with the execution of the Leases. *See Heritage Res., Inc.*, 939 S.W.2d at 121–22. Looking to those circumstances, it is clear that long before and at the time the Leases were executed, the traditional and widespread industry meaning of offset well was a well that protected the leasehold from being drained of its minerals. *See, e.g.*, *Offset Well*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) (defining "offset well" as "[a]n oil well dug for the specific purpose of preventing drainage of oil to adjoining property"); RICHARD LEROY BENOIT, CYCLOPEDIA OF OIL AND GAS FORMS §§ 168–70, at 205–07 (1926) (discussing offset well clauses and implying they are related to protection from drainage); DAN S. BOYD, THE STATE OF TEXAS, GOVERNOR'S ENERGY ADVISORY COUNCIL, LEGAL ASPECTS OF STATE-OWNED OIL AND GAS ENERGY RESOURCES 21–22 (1974) (discussing the Relinquishment Act's offset well clause and noting state leases expressly require the drilling of "offset wells" when drainage from nearby wells is actually occurring); EARL A. BROWN, THE LAW OF OIL AND GAS LEASES § 16.02(5)(D), at 317 (1958) (noting that the implied covenant of "the lessee to protect the leased premises against drainage from wells on adjoining

15

premises by drilling offset wells" can be superseded by an express clause); GRAYSON CECIL FOX, OIL AND GAS DRILLING FUNDS: A PRIMER FOR ATTORNEYS AND INVESTORS § 2.22(c), at 15–16 (1983) (observing that leases can provide for express covenants, "such as the covenant to offset if a well is brought in on adjacent property"); R.L. HANKINSON & R.L. HANKINSON JR., LANDMAN'S ENCYCLOPEDIA § 119, at 329 (2d ed. 1981) (containing a form of an "offset obligation waiver clause," which waives a lessee's express or implied obligations to drill "an offset or protection well" and waives the lessor's "claims or demands for damages occasioned by drainage of the lease premises" by an adjacent well); RICHARD W. HEMINGWAY, THE LAW OF OIL AND GAS § 8.6, at 565 (3d ed. 1991) (referring to an "express offset clause" as a clause "relating to the obligation of the lessee to drill offset or protection wells" and noting such clauses can supersede the implied covenant); EUGENE O. KUNTZ, THORNTON ON OIL AND GAS: CUMULATIVE SUPPLEMENT § 196, at 149 (1960) ("In the absence of an express provision, [there] is an implied duty . . . to afford protection against drainage by drilling offset wells."); JOHN S. LOWE, OIL AND GAS LAW 331 (4th ed. 2003) (stating that for a claim for a breach of the implied covenant to protect against drainage, a lessor must show substantial drainage and "a probability that an offset well would be profitable"); MAURICE H. MERRILL, COVENANTS IMPLIED IN OIL AND GAS LEASES § 94, at 234 (2d ed. 1940) ("If producing wells are drilled upon adjoining lands within draining distance of the line, it behooves the owner of the land to counteract their influence by 'offset' wells upon his own premises."); 1 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 5.3(B)(2), at 267–68 (1989) (noting that offset clauses "require the lessee to drill an offset if a well on other land is drilled within a specified maximum distance from the leased premises"); SAMUEL S. WYER, U.S.

16

NAT'L MUSEUM, BULLETIN 102, PT. 7, NATURAL GAS: ITS PRODUCTION, SERVICE, AND CONSERVATION 55–56 (1918) ("The primary feature to be borne in mind is that the offset well is drilled for purposes of protection, and that this is more important than hard and fast rules regarding exact location."); George A. Bibikos & Jeffrey C. King, *A Primer on Oil and Gas Law in the Marcellus Shale States*, 4 TEX. J. OIL GAS & ENERGY L. 155, 164 n.36 (2009) ("An *offset well* is defined as 'a well drilled on one tract of land to prevent the drainage of oil or gas to an adjoining tract of land, on which a well is being drilled or is already in production.'" (quoting 1 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 684 (2008))); *see also* JOSEPH SHADE, PRIMER ON THE TEXAS LAW OF OIL AND GAS, app. 10 (rev. 4th ed. 2012) ("Offset well. A well drilled on one tract of land to prevent the drainage of oil to an adjoining tract of land, on which a well is being drilled or is already in production."); *accord* TEX. NAT. RES. CODE § 52.173 (containing a statutory offset well clause with which parties leasing the mineral interests to state land must comply and stating that an "offset well shall be drilled to a depth and the means shall be employed which may be necessary to prevent undue drainage of oil or gas from beneath the state land").

Additionally, when the Leases were executed in 2009, this Court had for years referenced an offset well as a well located and drilled to protect against drainage. *See, e.g.*, *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 14 (Tex. 2008) (noting that landowners have recourse for drainage—drilling an offset well to protect against it); *Amoco Prod. Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex. 1981) (acknowledging that local drainage "can be prevented by drilling offset wells"); *Shell Oil Co. v. Stansbury*, 410 S.W.2d 187, 188 (Tex. 1966) (holding that an offset well clause required the lessee to drill an "offset well" in response to drainage); *Commonwealth of*

*Massachusetts v. Davis*, 168 S.W.2d 216, 223 (Tex. 1942) (discussing an offset well clause); *Brown v. Humble Oil & Ref. Co.*, 83 S.W.2d 935, 940 (Tex. 1935) (noting that at common law, an "adjoining landowner cannot complain if wells are drilled near his boundary line" and that the landowner can protect himself by drilling "offset wells"); *Tex. Pac. Coal & Oil Co. v. Barker*, 6 S.W.2d 1031, 1036 (Tex. 1928) (indicating that "offset well" refers to a well drilled in response to a producing well on an adjacent tract in order to protect against drainage).

However, Murphy maintains that in light of the "relatively modest drainage," as Murphy's expert described it, occurring in the Eagle Ford Shale, no reasonable person in 2009 would have ascribed the traditional meaning of offset well to this offset well clause. The Court, while acknowledging that we have "recognized that drilling an offset well can be a method of protecting against drainage," similarly uses the attributes of the Eagle Ford Shale to buttress its conclusion that Murphy's is the only reasonable interpretation. *Ante* at __. I disagree with both the conclusion and the use of the evidence supporting it.

First, the Court seems to criticize my using a string cite of "authorities that predate the advent of the type of drilling at issue here." *Ante* at __. Ordinarily, such cites might be relegated to a footnote. But in this instance, the cites are a substantive reflection of circumstances both preexisting the Leases and at the time the Leases were executed. Further, if a source did not exist at the time of or before execution of the Leases, then it cannot fairly be included in the circumstances surrounding their execution and does not shed any light on the parties' intent. The Court and Murphy effectively take the position that the advent of horizontal drilling has robbed offset well of its long-established meaning. But even a cursory survey of more current sources than

18

those I cite above showing the circumstances at the time the Leases were executed reveals this is not the case. *See, e.g.*, 55 TEX. JUR. 3D *Oil and Gas* § 217 (2018) ("Offset drilling may be used as a guard against drainage of oil and gas from under one owner's land caused by the withdrawal of oil and gas by an adjoining landowner. An obligation to drill offset wells may rest on the lessee, either by express provision of the lease or by implication."); NORMAN HYNE, DICTIONARY OF PETROLEUM EXPLORATION, DRILLING, & PRODUCTION 352 (2d ed. 2014) (defining "offset well" as "a well drilled on the next adjacent drilling and spacing unit to an existing well to compensate for and/or prevent drainage by that well"); R.D. LAGENKAMP, HANDBOOK OF OIL INDUSTRY TERMS & PHRASES 344 (6th ed. 2014) (defining "offset well" as "[a] well drilled on one tract of land to prevent the drainage of oil or gas to an adjoining tract where a well is being drilled or is already producing"); LEVONNE LOUIE, MINERAL LAND RIGHTS: WHAT YOU NEED TO KNOW ch. 6 (2014) ("The offset well clause provides a mechanism whereby landowners can protect themselves from drainage if a well is drilled on a DSU beside their land (the offset section)."); 2 NANCY SAINT-PAUL, SUMMERS OIL AND GAS § 17:7, at 511 (rev. 3d ed. 2016) (stating, in a section titled "Express covenant to drill offset wells," that "the modern oil and gas lease often contains an express covenant obligating the lessee to protect the leased land from drainage by drilling wells offsetting protective wells on adjacent lands"); JOSEPH SHADE & RONNIE BLACKWELL, PRIMER ON THE TEXAS LAW OF OIL & GAS app. A (5th ed. 2014) (defining offset well as a "well drilled on one tract of land to prevent the drainage of oil to an adjoining tract of land, on which a well is being drilled or is already in production"); 8 *Offset Well*, HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW 684 (LexisNexis Matthew Bender 2017) ("[An offset well is a] well drilled on one tract of land to

19

prevent the drainage of oil or gas to an adjoining tract of land, on which a well is being drilled or is already in production."). Recent cases from this Court also demonstrate our understanding of the term by using it without seeing the need to provide any explanation of its meaning. *See, e.g.*, *Hooks v. Samson Lone Star, Ltd.*, 457 S.W.3d 52, 67–68 (Tex. 2015); *Lesley v. Veterans Land Bd.*, 352 S.W.3d 479, 488 (Tex. 2011).

In short, before, at the time of, and even after the Leases were executed, offset well meant and continues to mean a well that protects a lease from the possibility of drainage.

Next, Murphy argues that the definition of "offset well," which developed in the context of vertical drilling and the implied covenant to protect the lease against drainage, is inapplicable to horizontal drilling operations utilizing hydraulic fracturing techniques in tight formations. Therefore, according to Murphy, any implied covenant cases discussing what an offset well is are unpersuasive. First, that argument does not address the intent of the parties to these Leases, which is the issue. Second, as noted above, even current industry sources do not reflect a change in the traditional definition and understanding of offset in light of new trends in oil and gas production and technology. As the Court discussed in *Coastal Oil*, the rule of capture and offset well concepts continue to apply in situations where tight formations such as the Eagle Ford are concerned. *See Coastal Oil*, 268 S.W.3d at 14. There, the Court applied the rule of capture to drainage caused by fracing across lease lines because, in part, mineral owners and lessors have adequate means of protecting themselves by drilling offset wells:

> [T]he law already affords the owner who claims drainage full recourse. This is the justification for the rule of capture, and it applies regardless of whether the drainage is due to fracing. If the drained owner has no well, he can drill one to offset drainage

from his property. If the minerals are leased and the lessee has not drilled a well, the owner can sue the lessee for violation of the implied covenant in the lease to protect against drainage.

*Id.*; *see also Ryan Consol. Petroleum Corp. v. Pickens*, 285 S.W.2d 201, 235 (Tex. 1955) (Wilson, J., dissenting) ("[T]he owner of the adjoining tract from which the oil is migrating can protect himself by drilling offset wells. This equal right to drill has always supported the constitutionality of the rule of capture. Take it away and the reason for the rule fails, leaving a result not only unjust but one inconsistent with the fundamental concept of ownership of oil and gas in place as a part of the realty.").

Further, the offset provision took the Herbsts out of the class of mineral lessors who must rely on the implied covenant requiring a mineral lessee to protect the minerals against drainage. To prevail in a suit against a lessee for breaching the implied covenant to protect the lease against drainage, the lessor has the threshold burden to prove that an adjacent well is "substantially draining" the leasehold. *Amoco Prod. Co.*, 622 S.W.2d at 658. As the Court recently explained:

> [D]etermining the value of oil and gas drained by hydraulic fracturing is the kind of issue the litigation process is least equipped to handle. One difficulty is that the material facts are hidden below miles of rock, making it difficult to ascertain what might have happened. Such difficulty in proof is one of the justifications for the rule of capture.

*Coastal Oil*, 268 S.W.3d at 16. But there is more. If a lessor overcomes this hurdle, then without an offset well provision in the lease, the lessor must also prove that a reasonably prudent operator would have drilled a well—an offset well—to protect against drainage by the triggering well on adjacent property, and that the offset well would be profitable. *Amoco Prod. Co.*, 622 S.W.2d at 572. As amicus curiae TLMOA points out, it is because of the expense, difficulty, and risk

21

associated with litigating such a suit against a lessee that lessors choose to have offset well provisions in their leases. Offset well provisions developed in the context of lessors having the difficult task of prevailing on a claim for breach of the lessee's implied covenant to protect against drainage. Therefore, we should not discount sources supporting the traditional understanding of what an offset well is simply because they dealt primarily with the implied covenant to protect against drainage.

I also would decline the opportunity to consider the Eagle Ford Shale's drainage attributes because the Leases say we should not do so. The Herbsts and Barrett clearly intended the Leases to include a "deemed drainage provision" because they put one in; the offset well clause provided that the lessee's obligations would be triggered if a producing well was completed within 467 feet of the leasehold:

> It is hereby specifically agreed and stipulated that in the event a well is completed as a producer of oil and/or gas on land adjacent and contiguous to the leased premises, and within 467 feet of the premises covered by this lease, that Lessee herein is hereby obligated to . . . [drill an offset well, pay royalties, or release acreage].

(Emphasis added). The Leases' tying the lessee's obligation solely to the completion of a producing well within a specified distance from the property line but without a requirement that the well be actually draining the property, avoided the Herbsts' having to shoulder the burden of proving the lessee breached the "substantial drainage" element of the implied covenant to protect the lease in the event a controversy such as this arose. *See* Bill Kroger & Jason Newman, *Understanding Hydrocarbon Trends: Ten Issues that Lawyers Can Help the Energy Industry Solve*, 52 HOUS. LAW. 10, 11 (2014) ( "[Some] leases create the concept of 'deemed drainage' that force an operator to drill

an offset well, release acreage, or pay compensatory royalties if a well is drilled on an adjacent lease within a set distance of the lease line (regardless of whether actual drainage is occurring or not)."). That is, the Leases deemed drainage to be occurring if such a producing well was completed.

Both the intent of the parties as reflected in the words of the Leases and the effect of the Leases are clear: to short circuit disputes between the Herbsts and their lessee regarding whether a well on adjacent premises and within 467 feet of the Herbsts' land was, might be, or could possibly be, draining minerals from the Herbsts' property. As to any such wells, the Herbsts would not have the burden to prove anything regarding the well's drainage because under the Leases, drainage would be deemed to be taking place. Rather, the lessee would have the obligation to drill an offset well or, in lieu of drilling, pay royalties or release acreage. Under the Leases, Murphy's predecessor and Murphy assumed the risk that a well such as the Lucas might not be draining the Herbsts' land, yet an offset well to protect against drainage was still required because drainage was deemed to be occurring. *See id.* at 11.

In asking that we consider the drainage characteristics of the Eagle Ford Shale, Murphy invites us to rewrite the Leases and re-institute the burden the Leases relieved the Herbsts of as lessors: in order to obtain relief regarding the Lucas well, the Herbsts would have to prove that the Lucas was or is actually draining minerals from the leased premises. That result would deprive the Herbsts of the benefit of their bargain with Barrett in obviating the need for the Herbsts to prove actual drainage of minerals where the "material facts are hidden below miles of rock." *See Coastal Oil*, 268 S.W.3d at 16. Although the Court acknowledges there is no dispute that "actual drainage was not required to trigger Murphy's obligations under the provision," *ante* at __ n.3, the implication

23

is that although the parties agreed upon a deemed drainage provision to protect the Herbsts' minerals from the possibility of drainage from vertical and horizontal wells and to relieve the Herbsts of a proof burden regarding drainage, the Court simply will not honor it because the Court decides in hindsight that it does not make sense in the context of horizontal drilling in tight shale formations. The Court is wrong to abrogate the deal the parties struck because in hindsight a better one might have been struck by Barrett while contracting with the Herbsts.

Murphy faults the court of appeals for assuming there was drainage for Murphy to protect against and expecting Murphy to prove either that it was protecting from such drainage or that there was no drainage. Murphy claims that offset well clauses are a "tradeoff": "The lessor gives up its freeform drainage-protection requirement under the implied covenant in exchange for shedding the onerous burdens of triggering that requirement, and the lessee gives up its insulation from offset well obligations in exchange for exactitude in the nature of those obligations." I agree that the clauses in question have the effect referenced by Murphy. After all, that is the point of including such offset well provisions in leases: obviating a lessor's having to prove substantial drainage where an adjacent well within a prescribed distance is concerned, and concomitantly providing choices for the lessee based on the lessee's evaluation of the economics involved, without requiring the parties to engage in expensive and extensive dispute resolution. Per the Leases' contractual provisions, the court of appeals did no more than the Leases provided for: presume that drainage existed where a well on adjacent land triggered the offset well clause. And if Murphy is correct that drainage cannot occur in the Eagle Ford Shale past 350 feet, it could have renegotiated the Leases to include that distance as the distance in the offset well provision—provided that the Herbsts would have agreed to the

24

change. But such negotiations or change did not take place. Moreover, the offset well clause's offset distance is 467 feet, which reflects the Railroad Commission's unmodified spacing requirements, further undermining Murphy's argument that the parties did not intend the traditional industry definition of an offset well. 16 TEX. ADMIN. CODE § 3.37(a)(1).

As support for its argument that in entering into the Leases the Herbsts and Barrett could not have intended the traditional definition of offset well because "little to no" drainage occurs in the Eagle Ford Shale, Murphy goes outside the Leases for evidence and relies heavily on McBeath's affidavit, which Murphy offered as summary judgment evidence. In his affidavit, McBeath states that the industry understands the term offset well as meaning "any well drilled on an adjacent lease or property," suggesting it does not matter where on the leased acreage it is drilled. McBeath also discusses the reservoir characteristics of the Eagle Ford Shale. He avers that the "conventional concept of drainage across lease lines has limited application in the [Eagle Ford Shale]." According to McBeath, this is so because due to the reservoir characteristics of the Eagle Ford Shale, "a relatively modest amount of reservoir is drained by each horizontal well." McBeath based this conclusion on (1) the experiences of other operators conducting horizontal drilling activities in the Eagle Ford Shale and (2) the fact that the Railroad Commission has adopted modified spacing rules for the Eagle Ford Shale to reflect this characteristic.

But what McBeath does not say is equally important. It is true that in determining whether a contract is ambiguous, courts may use evidence of the circumstances surrounding the contract's execution. *Brumitt*, 519 S.W.3d at 109–10. Our "primary concern . . . is to ascertain the true intentions of the parties as expressed in the instrument." *Valence Operating Co. v. Dorsett*, 164

S.W.3d 656, 662 (Tex. 2005). If that is the case, then evidence of the surrounding circumstances is relevant only if the parties at least could have known of such facts at the time of execution; otherwise, it would shed no light on what *the parties* intended when executing the contracts. McBeath never opines that the Lucas well does not in fact drain minerals from the Herbsts' lands, nor does he say that he reviewed any material or data regarding drainage from the Herbsts' land or by the Lucas well or the Herbst well. Further, no summary judgment evidence shows that at the time the Herbsts and Barrett entered into the Leases in 2009, the parties knew, or even could have known, of the Eagle Ford Shale's drainage characteristics or executed their leases in contemplation of those characteristics. Indeed, as noted above, the Leases specifically referenced both vertical and horizontal wells, but the offset well provision did not differentiate between the two types. McBeath only offers broad generalizations without ever offering any insight as to whether they actually apply to the Leases or whether the Herbsts and Barrett even could have known about them at the time of execution. And McBeath clearly was a stranger to any negotiations between Barrett and the Herbsts about terms of the Leases. I therefore would decline to consider the drainage attributes of the Eagle Ford Shale in determining whether the Leases are ambiguous because they have not been established to have been a part of the circumstances surrounding the execution of the Leases. *See Brumitt*, 519 S.W.3d at 109–10.

Murphy also contends that any requirement that an offset well be drilled near the lease line is overly simplistic in light of the "relatively modest drainage" that occurs in the Eagle Ford Shale and that the parties should be able to take advantage of Murphy's expertise, as a professional oil and gas operator, to choose the most productive location on the leased premises to drill a well. Murphy

further asserts that by reading offset well to impose an obligation to protect against drainage, the court of appeals and the Herbsts are placing extracontractual obligations into the Leases. However, as discussed above, at the time the Leases were entered into, offset well provisions were unquestionably placed in leases to address potential drainage, and Murphy makes no case that they were not. To the contrary, Murphy concedes as much when it argues that offset well provisions, rather than being meant to ensure protection from drainage, are included in leases to obviate the need to litigate claims for the breach of the implied covenant to protect against drainage.

The Court acknowledges the rule that evidence of the circumstances surrounding a contract's execution cannot be used to "add[] to, *alter* [], or contradict[] the contract's text." *Ante* at __ (emphasis added) (quoting *URI*, ___ S.W.3d at ___); *see also URI*, ___ S.W.3d at ___ ("[S]urrounding facts and circumstances cannot be employed to 'make the language say what it unambiguously does not say' or 'to show that the parties probably meant, or could have meant, something other than what their agreement stated.' In other words, extrinsic evidence may only be used to aid the understanding of an unambiguous contract's language, not change it or 'create ambiguity.'" (citations and quotations omitted)); *Brumitt*, 519 S.W.3d at 110 ("[C]ourts may not rely on evidence of surrounding circumstances to make the language say what it unambiguously does not say."). But in concluding that the parties could not have intended the traditional definition of offset well in light of the surrounding circumstances, the Court uses such evidence to alter the well-established meaning of the term.

The principle that allows use of circumstances surrounding a contract's execution to provide context for the words chosen is subject to misunderstanding and even misuse. *See URI*, ___ S.W.3d

at ___ ("Despite expounding on this principle from time to time, . . . it remains susceptible to confusion and inconsistency when applied to unambiguous contract terms."). As we recently explained, "Courts may consider the 'context in which an agreement is made' when determining whether the contract is ambiguous, but the parties may not rely on extrinsic evidence 'to create an ambiguity or to give the contract a meaning different from that which its language imports.'" *Brumitt*, 519 S.W.3d at 109–10 (quoting *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 451 (Tex. 2011)). Today, the Court finds a new way to use such evidence: it uses the evidence to say that there is no ambiguity and to effectively remove a word from the Leases, not just to determine whether there is an ambiguity.

Further, the Court reaches outside of the Leases to support its conclusions. The Court cites an article stating that production in the Eagle Ford Shale did not begin in earnest until the industry began using horizontal drilling and hydraulic fracturing in 2008 to combat the Eagle Ford Shale's drainage characteristics. *Ante* at __ n.4 (citing Bret Wells, *Please Give Us One More Oil Boom—I Promise Not to Screw It Up this Time: The Broken Promise of Casinghead Gas Flaring in the Eagle Ford Shale*, 9 TEX. J. OIL GAS & ENERGY L. 319, 348 (2013–2014)). This at most demonstrates that the parties *could* have been aware of the decreased drainage characteristics of the Eagle Ford Shale, not that they actually knew of and took them into consideration in entering into the Leases.

### C. Ambiguity

In sum, I would reject Murphy's attempt to ascribe either a new meaning or none at all to the word offset in the Leases. The Leases unambiguously required Murphy to drill an offset well—that is, a well reasonably located so as to protect against actual or potential substantial

28

drainage by the Lucas well. But that having been said, I recognize that my position regarding the offset well provision is not the same as that of a majority of the Court who conclude that Murphy is correct in its assertion that the Leases are unambiguous and that Murphy has complied with the Leases' provisions. Moreover, the Herbsts seek only to affirm the judgment of the court of appeals remanding the case to the trial court. In light of the foregoing, I conclude that even if my interpretation of the Leases is not the only reasonable one, it is at least a reasonable one, and the offset well clauses are ambiguous. In other words, even if Murphy's interpretation is seen as reasonable—a conclusion with which I disagree—the Herbsts' interpretation is also reasonable, meaning the Leases are ambiguous. *See Columbia Gas Transmission Corp.*, 940 S.W.2d at 589 ("[If] the contract is subject to two or more reasonable interpretations after applying the pertinent rules of construction, the contract is ambiguous."). And if the Leases are ambiguous, we may consider evidence of the parties' true, subjective intent. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) ("Only where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'" (quoting *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520)).

The only evidence in the record of what the parties to the Leases intended the offset well clause to mean is the deposition testimony of Shirley and William Herbst. In his deposition, William appears to have understood the offset clause as being included in order to protect against drainage, including drainage caused by both horizontal and vertical wells. Thus, William affirmed that the Herbsts knew the Leases specifically addressed both vertical and horizontal wells. He also

29

expressed some idea of what drainage refers to, but he did not discuss exactly why the offset clause was included, only that it was likely his lawyer's idea.

Shirley's deposition is more helpful in determining what the Herbsts intended offset well to mean. Shirley testified that before the Leases were signed, the family met to read and discuss them, and together they decided they wanted "protection" in the Leases. Shirley stated that "protection" included "[s]urface, drainage, water considerations, foliage, [and] brush." She went on to specifically state that by protection from "drainage," she meant the offset clause, which provided that "if a well was drilled adjacent to my property . . . that the oil company would come in and drill one as close as they could to my boundary line as the other well." She also indicated that the family wanted the offset clause in the Leases because they did "not want drainage, and [they] did not want to have the expense of proving drainage." She testified that at the time the Leases were signed, she was aware that horizontal drilling was occurring in the area and therefore it did not surprise her that the Leases needed to specifically address horizontal wells. On the other hand, there noticeably is no evidence regarding Barrett's subjective intent, meaning that the parties' intent has not been conclusively established. Summary judgment was thus improper in this case and the court of appeals properly reversed and remanded to the trial court for further proceedings.

### III. Conclusion

Because the record does not conclusively establish that the parties intended offset well to include a well such as the Herbst well, which was located approximately 2,000 feet from the triggering well on adjacent premises, summary judgment for Murphy was improper. *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015) ("[I]f the

30

contract is subject to two or more reasonable interpretations after applying the pertinent construction principles, the contract is ambiguous, creating a fact issue regarding the parties' intent. Summary judgment is not the proper vehicle for resolving disputes about an ambiguous contract." (citations omitted)).

I would affirm the judgment of the court of appeals remanding the case to the trial court for further proceedings.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** June 1, 2018

31