

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00375-CV

———————————————

SERENE COUNTRY HOMES, LLC, Appellant

V.

NORTHSTAR RANCH, LLC, Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-299063-18

Before Gabriel, Kerr, and Bassel, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

## I. Introduction

Appellant Serene Country Homes, LLC agreed to pay $24 million to Appellee Northstar Ranch LLC[1] for 733 acres of unimproved property in Fort Worth's extraterritorial jurisdiction that Serene planned to develop into a residential subdivision. Northstar promised under Section 6(b)(v) of the parties' contract that it would use good-faith and commercially reasonable efforts to enter into an access agreement with the Texas Department of Transportation (TxDOT) to connect the property to State Highway 287 (SH 287), which bordered the property; the access agreement would by necessity require an extension of an access road to connect an entrance to the property.

During the bench trial that ensued when Serene did not close on the transaction, Northstar claimed that it could retain Serene's earnest money because, among other things, it had satisfied Section 6(b)(v). The trial court agreed, signed a take-nothing judgment against Serene, and entered 135 findings of fact and 65 conclusions of law. Serene complains that the evidence is legally and factually insufficient to support the trial court's finding that Northstar had entered into a TxDOT access agreement.[2] We affirm.

---

[1]Northstar is the successor to the original seller.

[2]Northstar also argued at trial that Serene had repudiated or anticipatorily breached the contract and that Serene's breach-of-contract claim was barred by

## II. Background

The trial court heard two days of live testimony from Serene's Chief Executive Officer Joseph Attrux; from Ron Ramirez, a licensed professional engineer who had been Serene's executive vice president of engineering and development; from Mark Schluter, a former-TxDOT-engineer-turned-consultant hired by Northstar; and from Northstar principal Kim Gill. By agreement, the trial court also admitted into evidence over 150 exhibits, as well as deposition excerpts from TxDOT Area Engineer Edrean Cheng, who had been trained by Schluter; from real estate broker Matt Bilardi; from Serene's Chief Operating Officer Allan Lind; and from Robert Snelus, Serene's executive vice president of operations for home building and sales.

We begin by reviewing pertinent contract provisions and amendments and some of the trial court's unchallenged fact findings for context,[3] and we then review some key documentary evidence and additional unchallenged fact findings.

---

estoppel, quasi-estoppel, waiver, or deficient notice. The trial court found in Northstar's favor on these arguments, and in this appeal, Serene challenges those findings and raises a contract-construction issue. Because we find the TxDOT-access-agreement issue dispositive, we do not reach these remaining issues. *See* Tex. R. App. P. 47.1.

[3]Unchallenged fact-findings are entitled to the same weight as a jury's verdict and bind an appellate court unless either the contrary is established as a matter of law or no evidence supports the finding. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Inimitable Grp., L.P. v. Westwood Grp. Dev. II, Ltd.*, 264 S.W.3d 892, 902 & n.4 (Tex. App.—Fort Worth 2008, no pet.). In other words, we defer to unchallenged fact findings that some evidence supports. *Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

## A. The Parties' Contract and Contract Amendments

Section 6 of the parties' October 28, 2016 contract set out Serene's review period, how Serene could terminate the contract and get its earnest money back, and the items that Northstar had to obtain before Serene was required to close. Section 6(b), "Approvals, Consents and Agreements Contingency," required the following of Northstar:

> Seller shall use good faith and commercially reasonable efforts to obtain the following (collectively, the "Approvals, Consents and Agreements" [ACAs]):
>
> (i)     The approval of a preliminary plat of the Land by the City [of Fort Worth];[4]
>
> (ii)     The approval of a [Municipal Utility District] . . . for the Land by the Texas Commission on Environmental Quality (the "TCEQ") and the establishment of the MUD;
>
> (iii)     Enter into a Development and Utility Agreement(s) with the City of Fort Worth;
>
> (iv)     Enter into surface use agreement[s] with the various energy companies;
>
> (v)     Enter into an access agreement with the Texas Department of Transportation ("TxDOT") allowing the tie-in of Northstar Boulevard to SH 287; and
>
> (vi)     Receipt of written consent from the applicable railroad company [BNSF] that Northstar Boulevard can cross the railroad at-grade.

---

[4]A preliminary plat is essential to subdivide and develop land. *See generally* Tex. Loc. Gov't Code Ann. §§ 212.001, 232.001.

Seller shall keep Purchaser apprised of its progress in obtaining the [ACAs] and, upon Purchaser's written request, furnish Purchaser with any submission made to the City, the TCEQ or TxDOT and any proposed [ACAs]. Seller shall advise Purchaser in writing of the date when Seller has obtained all of the [ACAs] (the "ACA Date"). If Seller is unable to obtain the [ACAs] on or before May 20, 2017, then Purchaser may elect to terminate this Contract . . . whereupon the Earnest Money (less the Independent Consideration) shall be returned to Purchaser[.]

The contract stated that closing would be on the first business day to occur 30 days "immediately following the ACA Date, but in no event later than May 30, 2017," and declared that "Time is of the essence," notwithstanding two later amendments that changed both the ACA deadline and closing date.

The parties' March 2, 2017 amendment changed the ACA deadline to September 20 and deleted "but in no event later than May 30, 2017" from the closing deadline. The amendment also modified how and when Serene would deposit the $750,000 earnest money, made the earnest money directly payable to Northstar, and made the earnest money nonrefundable "under any and all circumstances other than as provided in Section 6(b) of the Contract, regarding the [ACAs], and Section 12(b), regarding Seller's default or breach." The parties' second amendment pushed the ACA deadline to November 20 and added that the closing date would occur "in no event prior to November 20, 2017," but changed nothing about the earnest-money provisions.

5

The trial court assessed conflicting testimony and found that Serene had asked for both amendments so that it could come up with the funds or financing to close.[5] Snelus said that after the first amendment, Serene knew that the only way it would get its earnest money back was if Northstar did not satisfy one of the Section 6(b) items.

## B. Uncontested Fact Findings—Background

Serene had never before acquired a raw tract of land that required access to a state highway, and it was inexperienced in developing residential subdivisions and in obtaining loans to do so from institutional lenders.

Gill, on the other hand, was experienced in both. Such was Gill's experience that several months before the parties entered into the Northstar contract, Serene's owners had asked him to consider becoming the fee developer for other lots that a Serene affiliate owned. Northstar, through Gill, had originated the Section 6(b) language because Gill had anticipated what an institutional lender would want to see before making a development loan.

With regard to Section 6(b)(v), TxDOT does not promulgate or use any specific form of "access agreement." Rather, if TxDOT's agent agrees to allow access—orally or in writing—TxDOT later will issue a "Permit to Construct Access Driveway Facilities," following which the access-construction project can be put out for bids after all environmental studies, traffic studies, final schematics, and final plans

---

[5]The trial court found that at no time did Serene acquire sufficient funds or financing to close.

have been completed. When a developer buys raw land, a development loan usually finances the costs of the final plans necessary to obtain a TxDOT permit. To obtain an access agreement for the tie-in, Northstar did not have to acquire a TxDOT permit by November 20, 2017.

Under Section 6(a), Serene had a separate 120-day review period from October 28, 2016, during which it could determine the feasibility of the tie-in's location and satisfy itself that developing the property was financially feasible. Serene received the property's preliminary plat showing the precise access point for the tie-in of Northstar Boulevard to SH 287,[6] as well as the tie-in's estimated cost. Because the costs to build the tie-in were reimbursable from the MUD,[7] Serene was not concerned with that cost, and it allowed the 120-day review period to expire on February 24, 2017, without terminating the contract.[8]

## C. The November 1, 2017 TxDOT Letter

On November 1, 2017, Cheng, the TxDOT area engineer, issued a letter drafted by Schluter and addressing Northstar's requested tie-in:

---

[6]The final City approval necessary for the preliminary plat occurred on November 14, 2017.

[7]The order granting the petition to create Northstar's MUD was issued on January 12, 2017.

[8]Attrux and Ramirez agreed that Serene had received a budget showing $2.4 million for the tie-in connection (Phase 1 of the SH 287 plans).

TxDOT is in agreement that access to the Northstar Development will be permitted via a tie-in of Northstar Boulevard to US 287. The exact location, dimensions and other aspects shall be determined following TxDOT's review of the plans and specifications.[9] This agreement is provided with the understanding that preliminary studies, including traffic and environmental, are still ongoing in determining the desirable alternative for schematic along the US 81/287 corridor. There may be adjustments and refinements during this process.[10]

TxDOT is supportive of the developer pursuing the extension of the existing two-way frontage road from the current terminus at Santa Fe Court to the entrance of the proposed Northstar development with an exit ramp from northbound US 81/287 to the frontage road for access to the development.

In addition, TxDOT is planning to construct a grade-separated interchange at Ram Horn Hill Road, north of your development. This work is currently planned in FY 2020. Once this project is completed or in conjunction with this proposed work, the northbound frontage road can be extended and converted to one-way operation.

## D. Northstar's November 17, 2017 Letter and Serene's Response

On November 17, Tim Fleet, one of Northstar's principals, sent Attrux a letter on which Northstar's and Serene's respective counsel were copied, stating,

Please be advised that all [ACAs] required under Section 6(b) of the Contract have been obtained and the "ACA Date" thereunder is November 17, 2017. Seller has kept Purchaser advised of Seller's

---

[9]Cheng said that "plans and specifications" referred to Northstar's final construction plans, which she expected to be included in Northstar's permit application.

[10]Cheng said that the intent behind this paragraph's last two sentences was to let the developer know TxDOT had not finalized its schematic, so under the worst-case scenario, grade adjustments could occur. Traffic and environmental studies were still ongoing as of November 1, 2017.

progress in obtaining the [ACAs],[11] but should you need anything further in that regard, please let us know.

Please also note that the "Closing Date" under the Contract shall be on or before December 18, 2017.

Serene's lawyer responded by email the same day, asking Fleet to send Attrux copies of the Section 6(b) documents. Three days later, Bilardi emailed to Attrux all the ACA documents, copying Fleet, Gill, and the parties' counsel. Included was the TxDOT Letter.

**E. Serene's November 22, 2017 Letter**

On November 22, Serene's lawyer wrote Northstar; the memo line read "Notice of Default of Paragraph 6b of Contract for Sale and Purchase of Unimproved Real Property ('Contract')." In the letter, Serene disputed that the TxDOT access agreement had been obtained.[12] Serene asserted that the TxDOT Letter was "not an access agreement" because "[i]t leaves open the question of location, dimensions and 'other aspects'" and was "subject to ongoing preliminary studies, including traffic and environmental (both of which can stop a deal)." Serene warned that if Northstar failed to cure the defaults within 15 days—by December 7, 2017—it would elect to terminate the contract and seek the return of its earnest money.

---

[11]Attrux said that Northstar had kept Serene apprised of its ACA progress through Peloton Land Solutions, the engineering firm that Northstar had hired.

[12]Serene disputed in the same letter that the BNSF consent had been obtained.

9

**F. Northstar's December 6, 2017 Letter and Attachments**

On December 6, Northstar's counsel responded, raising anticipatory breach and repudiation involving some comments Serene's agents had made earlier. To this letter, Northstar's counsel attached a December 5 letter from BNSF and a December 4 letter from Schluter to Gill (the Schluter Letter) about the TxDOT access agreement, in addition to another copy of the TxDOT Letter.

The Schluter Letter stated that Schluter's engineering firm had been "working diligently with the TxDOT to set the alignment and ramp locations for the permit plans" and anticipated a permit "around the middle of February 2018"; that the TxDOT Letter confirmed the agreement to allow the tie-in "by way of the frontage road extension and northbound exit ramp"; and that "[t]here is no issue as to whether the tie-in will be allowed, but some of the details concerning the grades and design parameters are still being discussed with TxDOT."

The Schluter Letter referenced a January 2016 meeting with TxDOT District Engineer Brian Barth to discuss confirmation of the access, and a February 2017 meeting with Cheng and John Cordary, another TxDOT engineer, to discuss details that included providing the access requested with the frontage road and exit ramp. Concerning Northstar's ability to rely on the TxDOT Letter, the Schluter Letter stated,

> [W]e are confident that the confirmation we have been provided thus far is as good or better than we have seen TxDOT commit to. The letter referenced is rarely provided by TxDOT, however, in this case, it has

been given. I worked at TxDOT in the Fort Worth District for 28 years. During that period, I served as Area Engineer for both Wise and Tarrant Counties, Director of Transportation Operations, and on the Access Permit Review Committee. You will never see a more firm[] commitment from TxDOT than you will see in the attached letter.

Schluter's accompanying credentials showed that he had started working for TxDOT in 1978, became a licensed professional engineer in 1983, and had retired from TxDOT in 2006 as the Director of Transportation for the nine counties in the Fort Worth District, which included Wise and Tarrant Counties.[13]

At trial, Attrux said that Serene had previously determined that the TxDOT Letter failed to satisfy Section 6(b). Attrux also said that he had read the Schluter Letter and did not believe Schluter's assertion that the TxDOT Letter was an access agreement, notwithstanding Schluter's experience or the fact that Schluter had hired and trained Cheng during his time at TxDOT.

**G. Serene's December 7, 2017 Letter and Northstar's Response**

Serene told Northstar to return the earnest money within ten days or be sued for its return. Northstar replied twelve days later, disputing Serene's contract

---

[13]Schluter's curriculum vitae reflected that as TxDOT Area Engineer, he had "[w]orked closely and collaboratively with City, County, State[,] and Federal elected officials to develop mutually a beneficial transportation system" while managing a diverse 100-person workforce that "was responsible for design, construction, maintenance[,] and operations in North Tarrant County, including the City of Fort Worth." He listed the $233 million interchange of Interstate 30 and State Highway 360, the $100 million Northeast Mall interchange, and the $30 million reconstruction of State Highway 114 through Southlake as notable projects during his TxDOT career.

interpretation and factual recitation and stating that Northstar would not return the earnest money. When Serene did not close, Northstar put the property back on the market.

## H. Additional Uncontested Fact Findings

In satisfaction of Section 6(b), Northstar had kept Serene apprised of its progress in obtaining the TxDOT access agreement, and the November 17, 2017 email from Serene's attorney to Fleet was Serene's only Section 6(b) written request for information.

The trial court found that because of Serene's inexperience, it had relied on Ramirez to determine whether Northstar had obtained the access agreement. But Ramirez had never obtained a TxDOT permit or access agreement to connect a residential development to a state highway, and the trial court found that Ramirez "did not know what an access agreement was at any time prior to or during trial." Further, Ramirez did not know the difference between a permit and an access agreement, did not know whether Section 6(b)(v) required something other than a permit, had never asked anyone at Northstar what an access agreement was, and had never contacted Schluter. The trial court found that Serene's claim that the TxDOT Letter did not constitute an access agreement was a pretext for Serene's inability to close so that Serene could reclaim its earnest money.

12

## I. The TxDOT Permit

On January 17, 2019, Schluter put his professional engineer's stamp on the final plans for the tie-in, and TxDOT issued the permit the next day. The permit stated that "[a]ny changes to the work shown on the plans will need to be reviewed and approved by TxDOT"; that "[t]he State reserves the right to require any changes, maintenance or repairs as may be necessary to provide protection of life or property on or adjacent to the highway prior to final acceptance"; and that "[t]he State reserves the right to require a new access driveway permit in the event of a material change in land use or change in driveway traffic volume or vehicle types."

## III. Discussion

Serene challenges the evidentiary sufficiency to support the trial court's finding that Northstar had entered into an access agreement with TxDOT.

### A. Standards of Review

A trial court's fact findings have the same force and dignity as a jury's answers to jury questions. *See Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's fact findings on disputed issues are not conclusive, and when the appellate record contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We review the sufficiency of the evidence supporting challenged

13

findings using the same standards that we apply to jury findings. *Catalina*, 881 S.W.2d at 297.

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports a finding, we must consider evidence favorable to the finding if a reasonable factfinder could and must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

When reviewing a finding for factual sufficiency, we set it aside only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on

14

reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). The factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## B. TxDOT Access Agreement

Serene acknowledges that "access agreement" is not defined in the parties' contract and does not "appear in the statutes or regulations governing TxDOT or on TxDOT's website," and it admits—as it did at trial—that the parties' contract did not require a TxDOT permit.[14] Our first task, then, before even reaching evidentiary sufficiency, is to determine what the parties' contract meant by "access agreement."

### 1. Contract Interpretation

Our primary objective in construing a contract is to give effect to the written expression of the parties' intent, and we interpret a contract's language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). We must consider the entire writing in an effort to harmonize and give effect to all its provisions so that none will be rendered meaningless. *Id.* at 889;

---

[14]Serene also asserts that it needed the TxDOT access agreement so that it could assess the property's economic feasibility, but it does not contest the trial court's finding that it used the 120-day review period to satisfy itself that developing the property—and the tie-in—was financially feasible. Attrux agreed during cross-examination that Serene was not claiming that the lack of cost information made the TxDOT Letter insufficient to meet Section 6(b)(v).

15

*Arlington Surgicare Partners, Ltd. v. CFLS Invs., LLC*, No. 02-15-00090-CV, 2015 WL 5766928, at *2 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.) ("A contract cannot be interpreted in a way that renders any words or phrases meaningless or in a way that leads to an absurd result."). Further, we may not rely on evidence of surrounding circumstances to make the contract's language say what it unambiguously does not say or to create an ambiguity. *Pathfinder Oil & Gas, Inc.*, 574 S.W.3d at 889. But we may consider objectively determinable facts and circumstances that contextualize the parties' transaction and inform the meaning of the language used as long as we do not use surrounding circumstances to alter or contradict an unambiguous contract's terms. *Murphy Expl. & Prod. Co.-USA v. Adams*, 560 S.W.3d 105, 109 (Tex. 2018); *see URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 757–58 (Tex. 2018) ("Contract language is thus construed in its lexical environment, which may include objectively determinable facts and circumstances that contextualize the parties' transaction."). Evidence of surrounding facts and circumstances may include evidence of industry custom and usage where appropriate. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 485 (Tex. 2019) ("When consideration of evidence as to industry custom and usage is appropriate, it is a question of fact for the [factfinder], and it is the province of the [factfinder] to weigh witness credibility.").

**2. The Contract's Language**

Section 6(b)'s ACA list encompassed three agreements, two approvals, and a written consent. In our quest to discern what "access agreement" meant, we will first consider the contract's uses of the word "agreement."

**a. "Agreement"**

As Northstar points out, while a contract is always an agreement, an agreement is not always a contract. That is, although the terms are sometimes used interchangeably, they are not synonymous. *Ferachi v. Cady*, No. 2-07-355-CV, 2009 WL 1506899, at *1 n.2 (Tex. App.—Fort Worth May 28, 2009, pet. denied) (mem. op.). "Agreement," as Serene acknowledges, refers to a manifestation of mutual assent by two or more persons while "contract" refers to a legally enforceable promise. *Id.* (citing Restatement (Second) of Contracts §§ 1, 3 (1981)); *see Rachal v. Reitz*, 403 S.W.3d 840, 845 (Tex. 2013) (noting that Black's Law Dictionary defines "agreement" as "a manifestation of mutual assent by two or more persons"). Parties to a contract are presumed to know the law and are likewise presumed to intend that their contract will have legal effect. *Phila. Indem. Ins. v. White*, 490 S.W.3d 468, 483 (Tex. 2016).

Under Section 6(b), in addition to the TxDOT "access agreement," Northstar was required to "[e]nter into a Development and Utility Agreement(s) with the City of Fort Worth" and to "[e]nter into surface use agreement[s] with the various energy companies."

17

A "Development and Utility Agreement" between a municipality and the owner of land located in the municipality's extraterritorial jurisdiction is specifically authorized by Local Government Code Section 212.172, which requires the agreement to be in writing. *See* Tex. Loc. Gov't Code Ann. § 212.172(b), (c).[15] The agreement "is binding on the municipality and the landowner and on their respective successors and assigns for the term of the agreement" but not on any end buyer of a fully developed and improved lot within the development (subject to other applicable land-use and development regulations). *Id.* § 212.172(f). The Development and Utility Agreement "constitutes a permit under Chapter 245."[16] *Id.* § 212.172(g).

---

[15]City Secretary Contract No. 49783, the "Development Agreement Between the City of Fort Worth, Texas and Northstar Ranch, LLC for the Far North Fort Worth Municipal Utility District No. 1 of Tarrant and Wise Counties," stated that Northstar, the MUD, and the City had entered into a utility and infrastructure agreement setting out the terms under which Northstar and the MUD would build roads and water, wastewater, and drainage infrastructure to serve the Property and the City would provide retail water and wastewater service to the Property. City Secretary Contract No. 49784, "Utility and Infrastructure Agreement," was the utility and infrastructure agreement referred to in the development agreement. *See* Tex. Loc. Gov't Code Ann. § 212.172.

[16]Local Government Code Chapter 245 governs the issuance of local permits within the context of land-use regulations. *See generally* Tex. Loc. Gov't Code Ann. §§ 211.001–250.009. Section 245.001 defines a "permit" under Chapter 245 as "a license, certificate, approval, registration, consent, permit, contract, or other agreement" for construction related to "a water or wastewater utility owned, operated, or controlled by a regulatory agency, or other form of authorization required by law, rule, regulation, order, or ordinance that a person must obtain to perform an action or initiate, continue, or complete a project for which the permit is sought." *Id.* § 245.001(1).

Section 6(b)(iii) thus required a statutorily compliant written contract between the City of Fort Worth and Northstar. *See Phila. Indem. Ins.*, 490 S.W.3d at 483.

With regard to the only surface-use agreement required under Section 6(b)(iv), Northstar and Devon Energy Production Company executed their agreement on November 16, 2017. In it, the energy company (a private entity) and Northstar agreed to specific terms, including the granting of a subsurface easement, which required a written agreement for enforceability. *See* Tex. Bus. & Com. Code Ann. § 26.01; Tex. Prop. Code Ann. § 5.021; *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983) ("An easement is an interest in land which is subject to the Statute of Frauds."); *Phila. Indem. Ins.*, 490 S.W.3d at 483.

But the final "agreement" in Section 6(b)—the one at issue in this case—was with a state agency, TxDOT. To determine whether "agreement" in this context required more than the manifestation of mutual assent, we must consider this agreement within the context of the word "access."

### b. "Access"

Through TxDOT, the State has the authority to create and maintain public roads and to regulate traffic on them under its police power. *See Brazoria Cty. v. Basin Credit Consultants, Inc.*, No. 07-01-00304-CV, 2002 WL 31084700, at *1 (Tex. App.—Amarillo Sept. 18, 2002, no pet.) (not designated for publication). As explained by various witnesses and in various documents during the trial, TxDOT controls access to highways, and if property is landlocked, TxDOT is legally obligated to allow access

19

for ingress and egress. But TxDOT will not allow a private-property owner to connect to a regionally significant highway without its permission. To understand how TxDOT grants such permission, we must consult the regulations governing TxDOT's exercise of its police power.

Although the Texas Administrative Code does not define "access agreement," within the context of "access management" it specifically addresses the process involved in obtaining a proposed tie-in[17] to a state highway. *See* 43 Tex. Admin. Code § 11.50. "Access management" is "an engineering and planning method of balancing the needs of mobility and safety on a highway system with the needs of access to adjacent land uses" to promote a coordinated intergovernmental long-term approach to land-use and transportation decisions within the context of public safety, quality of life, and economic development. *Id.* § 11.50(a).

---

[17]The Texas Administrative Code does not define "tie-in" either, but it does define "access connection": a "[f]acility for entry and/or exit such as a driveway, street, road, or highway that connects to a highway on the state highway system." *See* 43 Tex. Admin. Code § 11.51(1). The Code also defines "[p]latted access point," stating that it is an "access connection identified in a plat or replat of a subdivision of real property properly recorded in the county clerk's office in accordance with Property Code, § 12.002." *Id.* § 11.51(19). Under Property Code Section 12.002, a plat may not be recorded unless it has been approved "as provided by law by the appropriate authority." Tex. Prop. Code Ann. § 12.002(a), (b). To be recorded, among other things a plat must describe the subdivision by metes and bounds and state its dimensions, as well as the dimensions of each street, alley, square, park, or other part of the tract intended to be dedicated for public use. Tex. Loc. Gov't Code Ann. § 212.004(b)(1), (3). Because Section 6(b)(i) referred to the "approval"—but not the recording—of Northstar's preliminary plat, we conclude that "tie-in" as used in Section 6(b)(v) did not require a metes-and-bounds or other specific description.

With that purpose in mind, Subchapter C, "Access Connections to State Highways," is applied "to all new access connections constructed on highways on the state highway system," *id.* § 11.50(b), including to the issuance of a permit providing "for a definite understanding as to the location and manner in which the access connection will be constructed and maintained" before an access connection may be built. *Id.* § 11.52(a)(1), (2). Such a permit is not a contract, though; rather, it is a grant of authority from a governmental entity, regulating conduct through its police power, to do that which would otherwise be unlawful. *Brazoria Cty.*, 2002 WL 31084700, at *1–2 (noting that police powers cannot be bound by contract). That is, as several witnesses explained at trial, although a developer cannot build onto a state highway without TxDOT's permission, TxDOT does not enter into contracts with private developers to do so.

TxDOT's Access Management Manual (AAM), which sets out design criteria and which was admitted into evidence, is used by developers that want to build access to the state highway system and by TxDOT's engineers to evaluate such requests.[18] Factors that TxDOT considers in determining an access connection's precise location include design speed, traffic volume, truck-traffic volume, sight distance, and interval spacing between existing access points. According to the AAM, the number, location,

_____

[18]The AAM states, "Proper access management assists in protecting the substantial public investment in transportation by preserving roadway efficiency and enhancing traffic safety, thus reducing the need for expensive improvements. Furthermore, access management can significantly reduce traffic accidents, personal injury, and property damage."

21

spacing, design, and construction of access connections "have a direct and often significant effect on the safety and operation of [a] highway." Thus, TxDOT's standards "are necessary to enable the highway to continue to function effectively and safely in the future, while at the same time providing reasonable access to development."

The final expression of access management is the issuance of a written permit to allow construction. *See* 43 Tex. Admin. Code § 11.52(a)–(b). Here, both parties agreed that Section 6(b)(v) did not require the issuance of a permit. Accordingly, "access agreement," as used in Section 6(b)(v), means something less than or preliminary to the issuance of a TxDOT permit; otherwise, the contract would have stated "permit" instead of "access agreement," and "agreement" in this context is thus different from the other two usages of "agreement" in Section 6(b), both of which required a writing by law.

### c. Section 6(b)'s Other Provisions—"Consent" and "Approval"

The final subsection of Section 6(b), requiring "[r]eceipt of written consent" from BNSF so that Northstar Boulevard could cross the railroad at grade, supports the trial court's interpretation that the TxDOT "access agreement" did not have to be in writing. That is, based on the contract's language, the parties must have intended the TxDOT "access agreement" to mean something other than a "written consent" or they would have put "written consent" in both places.

Section 6(b) also required two "approvals"—one by the City of Fort Worth with regard to the preliminary plat and one by TCEQ to establish the MUD. Because TxDOT's approval of Northstar's tie-in plans would have resulted in the issuance of a permit, which the contract did not require, the "access agreement" was also not an "approval" as that word was used elsewhere in Section 6(b). *Cf. Barrow-Shaver Res. Co.*, 590 S.W.3d at 480 (defining "consent" as "approval" based on its "plain, ordinary, and generally accepted meaning").

### 3. Surrounding Circumstances

Based on the above, because the TxDOT "access agreement" was substantially different from the other items in Section 6(b), we must next consider the objectively determinable facts and circumstances surrounding the parties' transaction to identify what they meant by requiring Northstar to "enter[ ] into" an access agreement. *See Murphy Expl.*, 560 S.W.3d at 109.

The access here was not for "a simple driveway permit." Rather, it included building an off ramp and extending a two-way frontage road in a corridor that TxDOT had long been planning from I-35 to SH 114.[19] How long it takes from obtaining TxDOT's initial agreement to allow access to finally receiving a permit for

---

[19]Because freeway main lanes involve the "highest level of mobility" in terms of speed, they provide no direct access to property; instead, access is provided only at interchanges and ramps. Cheng said that there would be "quite a bit" of detail for the connection sought by Northstar and that its permit-application packet might be 100 to 200 pages, containing construction drawings, schematics, engineering plans, and studies.

construction is related to the project's complexity,[20] and Cheng said that the Northstar project was an "8" on a complexity scale of 1 to 10, 10 being the most complex.

The AAM recommends that developers meet with TxDOT staff and any governing municipality "[a]s early as possible in the development process" to discuss the specific requirements associated with obtaining access to the state highway system and to define the requirements for any needed engineering study or traffic-impact analysis. Accordingly, in early 2015 and with the goal of obtaining a TxDOT permit, Gill hired Schluter to be Northstar's project manager and point of contact with TxDOT. Schluter began discussions with TxDOT about the tie-in access in February 2015.

By October 2015, Schluter and TxDOT engineer Cordary were discussing environmental schematics for US 81/287, and TxDOT's consultants were examining adding one-way frontage roads on each side of the corridor and preparing preliminary schematics and traffic forecasts.[21] At that point, TxDOT estimated that the preliminary engineering study would take until around October 2017.

_____

[20]Depending on the type of traffic that a development might generate, in deciding to issue a permit TxDOT might require a traffic-engineering study, and it would consider the layout of the highway system and proposed access, as well as the impact on drainage onto the state highway system or the right-of-way, as well as utilities (proposed or in place), and environmental issues.

[21]Schluter had originally sought to include Northstar's proposed section in TxDOT's overall corridor-improvement plan, which covered a 15-mile span from I-35 to SH 114, instead of pulling out "a one mile section."

Around the time Bilardi was introducing Attrux to Gill as someone who could help Serene develop the raw land it had been buying, Northstar was already presenting concept drawings to TxDOT with the access connection's proposed location. In July 2016, TxDOT moved forward with a traffic study on the project.

Schluter continued to work between TxDOT and Peloton, Northstar's engineering firm, and in September 2016—a month before Northstar and Serene signed their contract—TxDOT's Cordary sent a letter to Fort Worth's Transportation and Public Works Department to inform the City that TxDOT officials had met with Northstar representatives "to evaluate access from the proposed development to the US 81/287 corridor." Cordary's letter stated that the discussion had covered extending the existing two-way frontage road from its ending point at Santa Fe Court to the property's entrance and building an exit ramp to the proposed frontage road (which became Phase 1 of the project), and converting the existing two-way frontage road to a one-way configuration and extending the frontage road from Santa Fe Court to the proposed Ramhorn Hill interchange (which became known as Phase 2).

A 42-page traffic-impact analysis was completed October 5, 2016, and the first preliminary plat was prepared October 7, 2016, at which time TxDOT had begun reviewing the access connection's placement. Some three weeks later, the parties signed their contract on October 28, 2016.

By that time, Northstar was already well underway to achieving mutual assent with TxDOT for a tie-in of Northstar Boulevard to SH 287.[22] *See Ferachi*, 2009 WL 1506899, at *1 n.2. Based on the surrounding circumstances, as well as the above-discussed contractual language and the policy purposes underlying that language, we construe Section 6(b)(v)'s "enter into" requirement to mean nothing more than some manifestation of Northstar's and TxDOT's mutual assent to the tie-in connection. And as we discuss later, the record amply manifests that mutual assent.

### 4. Serene's Arguments

Serene argues that Section 6(b)(v) required Northstar to "enter into a written access agreement in which Northstar and TxDOT agreed to the precise location of the entry and exit point where TxDOT would allow the final connection of Northstar Boulevard to SH287." But Serene's interpretation adds words to the contract's plain

---

[22]In contrast, Northstar began talking with BNSF in November 2016, and BNSF's January 6, 2017 letter stated that BNSF would "support the project," which included the permanent elimination and closure of two adjacent crossings identified by location and Department of Transportation identification number. When Serene later told Northstar that this letter was insufficient to satisfy Section 6(b)(vi) and gave Northstar until December 7 to cure it, Northstar obtained another letter from BNSF. In that December 2017 letter, BNSF stated that it "ha[d] approved the creation of an at-grade crossing for the proposed Northstar Parkway subject only to the satisfaction of the following conditions, each of which is customarily required for new at-grade crossings." The letter set out as conditions the same elimination of the adjacent crossings, in addition to "BNSF's approval of final design which meets [its] standard criteria," the purchase from BNSF of a permanent street easement and a temporary construction license, and reimbursement to BNSF "of actual cost of all railroad work necessary" for the installation. Attrux and Ramirez both agreed at trial that BNSF's supplemental letter met Section 6(b)(vi)'s "written consent" requirement. *See Barrow-Shaver Res. Co.*, 590 S.W.3d at 480 (equating consent with approval).

26

language, which says nothing about whether the agreement may be oral or must be written—and Serene conceded at trial that the Section 6(b)(v) agreement "didn't have to be in writing."

Serene also contends that what TxDOT gave Northstar amounted to an oral license that failed to satisfy the statute of frauds and that we should consider factors set out by the supreme court in determining whether the TxDOT Letter constituted the final expression of an access agreement between Northstar and TxDOT. But this would require us to ignore how the Texas Administrative Code treats access management, the final expression of which is the issuance of a permit allowing construction. *See* 43 Tex. Admin. Code § 11.52(a)–(b). Although not defining "access agreement," the Code does specifically address the process involved in obtaining a proposed tie-in to a state highway within the context of "access management." *See id.* § 11.50. And TxDOT was not granting Northstar a statute-of-frauds-covered interest in real property. *Cf.* Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(4)–(5).

To the contrary, Northstar's ultimate goal upon securing TxDOT's agreement was to get a construction permit, which is not a real-property conveyance—Section 11.52 specifically provides that "[n]o term or condition of a permit will be construed to grant, convey, or extinguish an interest in real property held by either the state or a permittee." 43 Tex. Admin. Code § 11.52(a)(3); *cf.* Tex. Prop. Code Ann. § 5.021 (stating that a conveyance of an estate in land for more than one year must be in writing); Tex. Transp. Code Ann. § 202.021(a) (noting that Texas Transportation

27

Commission can recommend sale or transfer of real property determined "no longer needed for a state highway purpose").

Further, although Serene notes that the statute of frauds requires a writing for "an agreement which is not to be performed within one year of making the agreement," Tex. Bus. & Com. Code Ann. § 26.01(b)(6), it does so in the context of arguing that a TxDOT agreement is like a perpetual license. But Serene cites no authority suggesting that we must or should consider state-agency action in that light. Moreover, no one disputed that working with TxDOT could take a long time, in part due to the evolving nature of the public's transportation needs, as well as TxDOT's budgetary constraints—indeed, Phase 2, the Ramhorn Hill interchange, had been on TxDOT's books for the last 30 or 40 years. The ultimately issued permit contained TxDOT's reservation of rights to require future changes "to provide protection of life or property on or adjacent to the highway" and to require a new permit if a "material change" occurred in land use or traffic volume or vehicle types. Because of the very nature of TxDOT's work, then, we conclude that the "access agreement" here was simply not the type of agreement to which the statute of frauds applies.

Finally, Serene argues that the contractual "access agreement" was to be unconditional (notwithstanding the lack of any language in Section 6(b)(v) to make it so) and that the trial court thereby erred by concluding that it could have been an oral agreement that was subject to finalizing such underlying details as the access point's precise location. Adopting Serene's interpretation would require us to ignore that the

TxDOT permit itself was conditional with regard to TxDOT's "review[ ] and approv[al]" and was subject to amendment for any material changes affecting public safety, something undoubtedly true of all such TxDOT permits.

Because the ultimate permit is conditional, the trial court did not err by concluding that the pre-permit access agreement must of necessity also have been conditional. And although Serene argues that the access agreement had to specifically identify the tie-in's access point to be valid, nothing in Section 6(b)(v) requires this specificity because neither the access agreement nor the permit constituted a conveyance. *Cf. Savering v. City of Mansfield*, 505 S.W.3d 33, 47 (Tex. App.—Fort Worth 2016, pet. denied) (op. on en banc reconsideration) ("An instrument that conveys land must contain a sufficient legal description, or it is void under the statute of frauds.").

### 5. Conclusion

Words must be construed within their contexts because "a single word can carry subtle—and significant—differences in meaning when applied to different situations." *URI, Inc.*, 543 S.W.3d at 764. In Section 6(b), "agreement" was used three different ways. Given the facts and circumstances surrounding the contract's execution, as a matter of law Section 6(b)(v) required nothing more than an oral agreement by TxDOT, as a state agency, to allow Northstar to tie in the property to SH 287 based on the continuing work on the project among Northstar, TxDOT, and the City of Fort Worth, and subject to conditions imposed by TxDOT so that it could

29

exercise its police power regarding public safety. *Cf.* Tex. Bus. & Com. Code Ann. § 26.01(a), (b)(6).

We now turn to whether the evidence sufficed to support the trial court's finding that Northstar had in fact entered into an access agreement with TxDOT allowing the tie-in of Northstar Boulevard to SH 287.

## C. Sufficiency

In addition to the unchallenged fact findings that support the trial court's conclusion that Northstar used good-faith and commercially reasonable efforts to enter into an access agreement with TxDOT, the record reflects the following chronology of TxDOT's assent to the tie-in between October 2016, when the parties entered into the contract, and the November 2017 TxDOT Letter, which Northstar put forth as a written manifestation of TxDOT's agreement to the access tie-in.

### 1. Chronology

As noted, for a year before the parties signed the contract, Schluter had been working closely with TxDOT to figure out how the proposed tie-in would fit with TxDOT's existing plans, traffic forecasts, and traffic-impact analyses for the 15-mile corridor so that, among other things, the tie-in (Phase 1) could be included in the preliminary plat that required City approval.

By February 2017, Peloton engineers had told Ramirez that Northstar had "a commitment from TxDOT to be able to provide the access as requested"[23] and that "it's just the logistics of how it will happen. Currently, TxDOT is looking at lumping in some of the Environmental Study work in their overall plan for the region to speed things up." A few days later, another Peloton employee sent Ramirez a copy of Cordary's September 22, 2016 letter to the City that had been provided with the preliminary plat application.[24] A week after Peloton told Ramirez about TxDOT's access commitment, Schluter and Gill met with Cheng and Cordary to discuss the construction timeline, but momentum slowed as from April to July 2017 TxDOT waited to see if it would get funding for the entire corridor project.[25] Even though TxDOT's timeline for construction bid-letting for Phase 2 ended up slipping from 2019 to 2020, by July 13, 2017, according to Schluter, TxDOT had agreed that Northstar could "just do the ramp and extension from Santa Fe Court to Northstar Blvd" (Phase 1).

---

[23]Ramirez said that he had found this information encouraging "but a long way from what [Serene] needed to satisfy the conditions of the contract."

[24]Ramirez stated, "I thought it was useful information for the project and necessary information, but it did not meet the requirements of paragraph 6(b)(5) of the contract" because he wanted to see a precise location, in writing, without qualifications, limitations, or conditions.

[25]During her 2018 deposition, Cheng observed that with regard to the I-35-to-SH-114 schematic, "it's been over three years and we still don't have a schematic in place."

After Schluter repeatedly sought TxDOT confirmation about the Santa Fe Court–Northstar Boulevard connection and exit ramp as part of what the City required Northstar to show, a TxDOT project manager contacted him asking to whom at the City Northstar wanted its "Northstar access" letter sent and what the letter should say. On July 21, 2017, Schluter set out the following to include in TxDOT's letter to the City:

> After reviewing multiple options regarding the proposed intersection of the new Northstar Parkway with US Hwy 81/287, TxDOT has determined that this intersection should be designed and implemented in two phases.
>
> - The initial phase will function as an interim condition until the Ramhorn Hill Road interchange is built. The initial phase will consist of extending the existing 2-way frontage road north to the Northstar [Boulevard] intersection and construction of the northbound exit ramp from NB US 81/287 to Northstar [Boulevard]. The developer is committed to funding these initial improvements.
>
> - Phase 2 will be constructed in conjunction with the Ram Horn Hill interchange project. This will include the extension of the northbound frontage road from Northstar [Boulevard] to the interchange. Once the Ramhorn Hill Road interchange and frontage road are built, the frontage road will [be] converted to one-way operation. This will be funded as part of the interchange project by TxDOT.

Three days later, Schluter's TxDOT contact emailed that information to one of the Peloton engineers and told him that TxDOT had not yet approved Phase 1—the ramp's location was still subject to relocation "after review of topo[graphy] in area,"

and Northstar Boulevard's location was still approximate—and that TxDOT was not yet on board with TxDOT's funding the proposed Phase 2.[26]

On August 9, 2017, Cheng emailed Schluter and Gill:

With the understanding that preliminary studies, including traffic and environmental, are still ongoing in determining the desirable alternative for schematic along the US81/287 corridor and adjustments/refinements should be expected risks of the developer, TxDOT is supportive of the developer pursuing the extension of the existing two-way frontage road from the current terminus at Santa Fe Court to the entrance of the proposed Northstar development with an exit ramp from northbound US81/287 to the frontage road for access to the development.

A couple of weeks later, Gill told Attrux, Snelus, Lind, and Bilardi at their August 24 meeting that Northstar had received TxDOT's "verbal" approval for access.[27]

In October, Schluter started drafting the TxDOT Letter using some of the language from Cheng's August 9 email. Northstar's lawyer tried to add "agreement" language and signature lines to the letter draft, and on October 20, Schluter sent the additional language to Cheng. Cheng told him, "I'm okay with the language in the letter except[] for the last sentence, 'please execute this agreement.'" Cheng said at her deposition that she had not been "okay" with the "agreement" language because at

---

[26]Because all Northstar had to show was mutual assent to a tie-in of Northstar Boulevard to SH 287, the trial court could have reasonably found that Phase 2 discussions were irrelevant.

[27]Attrux testified that he did not recall Gill's telling him about TxDOT's oral agreement to allow access and said that the subject did not come up at all during the meeting.

that point it was "not an agreement." Cheng and Schluter apparently did not have the same idea of what "agreement" connoted: Cheng testified that a permit was in writing because it was an "agreement" between TxDOT and a developer while Schluter defined "agreement" as "mutual consent by two parties and agreeing to terms and conditions that are very similar to what are listed on a [permit]."

Cheng said that the TxDOT Letter's intent had been to advise the developer that TxDOT supported its pursuing a tie-in connection. On November 1, Gill told Schluter he could take out the sentence that Cheng found objectionable.

On November 5, a TxDOT engineer emailed Schluter to let him know that there would still be uncertainty regarding "the final direction in the ultimate schematic" because the "stakeholders and public" had not yet "been presented the alternatives," including reasonable access to adjacent property owners.

Two days later, Ramirez contacted Peloton for an update on the Section 6(b) items, but he denied at trial that when he asked for this information he had been looking for a way for Serene to get out of the contract. When Gill learned about Ramirez's inquiry, he replied, "I take it as a good sign but we have all the contractual obligations but the surface agreement so I'm not worried about them getting out [of the contract]." Fleet suggested asking Serene if it wanted a 30-day extension to get financing and "to make sure [Northstar had] the surface use agreement signed."

After Serene sent its November 22 notice-of-default letter disputing Northstar's compliance with Section 6(b)(v), on November 28, Northstar's attorney

emailed Gill and copied Fleet, asking whether they could get TxDOT to write another letter. Northstar's attorney recommended that a new letter reference or attach the TxDOT Letter and state that "[t]he attached letter evidences TxDOT's agreement to allow the tie-in of Northstar Boulevard to US 287 in our customary format. There is no issue as to whether the tie-in will be allowed, but some of the parameters pertaining to same have yet to be determined, pending completion of the referenced studies."

This message was sent to Schluter, who forwarded it to Cheng and told her to feel free to refuse, stating, "These crazy attorneys are always asking for something. I am forwarding a request . . . to write another letter to state the obvious of the first letter. You have been very gracious in accommodating them thus far and I wouldn't blame you if you just said no." In her deposition, Cheng said that she did not think that she and Schluter ever came to any resolution on this request. Northstar ended up attaching the Schluter Letter to its December 6 letter to Serene.

### 2. Parties' Interpretation of Events

Cheng said that as of her August 9 email, TxDOT had not yet selected one specific alternative for access and that refinements, changes, and possible revisions were still to be made but that Northstar knew where it wanted the access and knew that it would have to pay for the frontage-road extension. She also stated that the connection's exact location did not depend on TxDOT's Phase 2 planning. To her,

35

the language in Schluter's TxDOT Letter draft did not differ significantly from what she had told Northstar in her August 9 email.

Cheng stated that as of November 1, TxDOT and Northstar "[had] had an understanding that . . . this development [was] coming into place. And the understanding [was], you know, in talking to the developer that we . . . [would] at some point . . . however the access [was] designed, or end[ed] up being, that we [would] be . . . allowing access to their development" even though no definitive agreement existed at that time on the proposed connection's exact location, dimensions, design, grade elevations, alignment, drainage plans, or other aspects of the access connection that were subject to TxDOT approval in the permit application.

Schluter, who had worked for TxDOT for almost three decades and who had sat on TxDOT's access-permit review committee, testified that TxDOT would first orally agree for access, with details to follow as illustrated in the permit's issuance. On cross-examination, however, Schluter acknowledged that such a general concurrence or tacit agreement or understanding between the developer and TxDOT was not an access agreement.

Schluter stated that in early 2015, TxDOT had orally agreed—as was typical, he said, in the majority of cases—to allow Northstar access to SH 287 and that Northstar had "always kn[own] where the point of access into the property was from the right-of-way, but everything fluctuated a little bit, as far as where [would] we put the ramp, where [would] we put the drainage structures, the width of the roadway and things."

36

Until the minor tweaking stopped, Northstar could not prepare a final set of plans to present with the permit application.

Schluter said that when he had worked for TxDOT, he had never signed off on a letter like the TxDOT Letter because it had not been in his authority "to grant access at a level that [TxDOT did not] have the detail yet." Schluter said that he had never seen a written TxDOT access agreement but that he had no doubt that by November 20, 2017, TxDOT had agreed to allow the tie-in and no doubt that Northstar would receive a permit. Schluter said that in his 28 years at TxDOT, he had never seen TxDOT rescind or pull back an unwritten agreement to allow access.

Gill echoed Schluter's testimony, stating that the TxDOT Letter was the first time he had ever gotten a letter from TxDOT directly to the developer. He said that he had pushed in October 2017 for that letter because he "felt like it would solidify [Serene's] comfort level in the TxDOT access agreement" and he wanted Serene to have everything it needed to get financing so that it would close. Gill said that the Serene team had appeared to be very inexperienced with that type of development, so he felt the letter would be helpful to Serene's lender "[t]o solidify that access was available by TxDOT."

Gill said that he did not obtain the Section 6(b) items in October 2016 (when the parties signed the contract) or in March 2017 (when the parties first extended the deadline) because "early on it had been [his] experience with TxDOT that once [he]

had met with them and had verbal agreements with them that they were going to give [him] access to any of [his] projects, [he] knew [he] would get access."

Attrux said that he had read the Schluter Letter and did not believe Schluter's assertion that the TxDOT Letter was an access agreement, notwithstanding Schluter's experience or the fact that Schluter had hired and trained Cheng during the 28 years he worked for TxDOT. Attrux said that Serene had determined that the TxDOT Letter was insufficient to meet Section 6(b)(v) based on what Ramirez had told him.

But Ramirez had also never seen a written access agreement and did not know what one was, and he did not have Schluter's level of experience with TxDOT. Ramirez said that the largest development project he had worked on to obtain an access connection had been a 300-acre multifamily-housing development (an apartment complex) in Lewisville off of State Highway 121. He had never obtained a TxDOT permit for a residential subdivision.

### 3. Application

The record reflects that by the end of July 2017, Northstar had long since demonstrated to TxDOT its commitment to extending the existing frontage road to what would eventually be Northstar Boulevard (once the City approved the preliminary plat) and to building a northbound exit ramp from SH 287 to Northstar Boulevard. And the trial court could have found that by the time Cheng issued the TxDOT Letter on November 1, 2017, a mutual understanding existed between Northstar and TxDOT that the Northstar development would be allowed to tie-in to

SH 287, with the details to be ultimately finalized in a permit. The trial court thus could have reasonably concluded that Northstar had entered into an access agreement—something more than an approval or consent but less than a contract—with TxDOT to allow the tie-in.

Because the trial court was entitled to consider all the documentary evidence and to find the testimony of witnesses experienced in working with TxDOT more credible than that of witnesses who had never before sought TxDOT's permission to tie in access to a state highway for a residential subdivision, we conclude that the evidence suffices both legally and factually to support the trial court's finding, and we overrule Serene's second issue. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761; *see also Liberty Mut. Ins. v. Burk*, 295 S.W.3d 771, 777 (Tex. App.—Fort Worth 2009, no pet.) (noting that in a bench trial, the trial court is the "sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony").

Because we hold that the evidence is legally and factually sufficient to support the trial court's finding that Northstar had satisfied Section 6(b)(v), Northstar could contractually keep Serene's earnest money when Serene refused to close the contract, and we need not reach Serene's remaining issues. *See* Tex. R. App. P. 47.1.

39

## IV. Conclusion

Having overruled Serene's dispositive issue, we affirm the trial court's judgment.

/s/ Elizabeth Kerr

Elizabeth Kerr
Justice

Delivered: December 10, 2020