

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-21-00085-CV
_____

OSPRIN II, LLC, Appellant

V.

TX 1111 RUSK GP LLC, LEON J. BACKES, RUSK INVESTOR, LLC,
AND STONEHENGE CAPITAL COMPANY, LLC, Appellees

On Appeal from the 295th District Court
Harris County, Texas
Trial Court No. 2018-25871

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice Stevens

MEMORANDUM OPINION

In conjunction with the historic rehabilitation of the Texaco building in downtown Houston, Texas, TX 1111 Rusk GP LLC obtained a non-recourse bridge loan from First NBC Bank in New Orleans in the original amount of $20,000,000.00,[1] which was secured by a security interest and assignment of TX 1111's interest in certain tax credit equity proceeds or capital contributions related to anticipated state tax credits. First NBC also obtained the personal guaranty of Leon J. Backes for the amounts due and owing under the bridge loan, up to $20,000,000.00. After First NBC's successor-in-interest, Osprin II, LLC,[2] sued TX 1111, Backes, and others to secure its collateral and enforce the guaranty, the trial court held a bench trial, entered a take-nothing judgment in favor of TX 1111 and Backes, and awarded attorney fees to both Osprin and Backes.

In this appeal, we are asked to determine whether the original parties to the guaranty intended that all of Backes's obligations under the guaranty, including those that had matured, end upon the fulfillment of the terms of the guaranty's termination clause. The trial court concluded that this was the parties' intent. We agree, and for the reasons stated below, we affirm the take-nothing judgment.[3,4]

---

[1] The loan amount was subsequently increased to $30,000,000.00.

[2] In April 2017, First NBC was placed in receivership, and Osprin purchased the bridge loan from the FDIC in October 2017.

[3] Originally appealed to the Fourteenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between precedent of the Fourteenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

## I.     Background

The Texaco building,[5] which was the former headquarters of Texaco, Inc., f/k/a The Texas Company, is located at 1111 Rusk Street in Houston. It is registered as a historical landmark by both the Texas and Federal governments. In 2013, it was vacant, uninhabitable, and in a state of disrepair.

Because of its historic designation, the Texaco building was eligible to participate in the Federal Historic Preservation Tax Incentive Program. The federal program is administered by the Internal Revenue Service and was created to incentivize the private sector to invest in the rehabilitation and re-use of historic buildings by offering federal income tax credits to developers undertaking such efforts. The income tax credits are available for qualified rehabilitation expenditures (also known as QREs), which are amounts spent on the rehabilitation of historic components of a building, as determined by the Secretary of the Interior.

The application to qualify for the income tax credits in the federal program consists of three parts, Parts 1, 2, and 3, which are submitted to and must be approved by the National Park Service (NPS). Part 1 requests that the historic building be deemed eligible for historic rehabilitation tax credits. Part 2 requires a description of the scope of work with a request that

---

[4]On appeal, Osprin contends that the trial court erred in (1) rendering a take-nothing judgment in favor of Backes, (2) awarding Backes attorney fees, (3) failing to award Osprin all its attorney fees, and (4) failing to award Osprin attorney fees against TX 1111. On cross-appeal, Backes contends that the trial court erred in awarding attorney fees to Osprin. Because we find that (1) the trial court did not err in rendering its take-nothing judgment, (2) Osprin's complaints that the trial court awarded attorney fees to Backes and failed to award it all of its attorney fees are without merit, (3) the trial court did not abuse its discretion in its attorney fee awards under the Uniform Declaratory Judgment Act (UDJA), (4) the trial court did not abuse its discretion in not awarding Osprin attorney fees against TX 1111 under the UDJA, and (5) Osprin was not entitled to attorney fees against TX 1111 under an indemnity provision, we will affirm the trial court's judgment.

[5]The Texaco building actually consisted of three buildings built in 1915, 1936, and 1959.

the proposed scope of work it describes be deemed eligible for historic tax credits.  Because it may be necessary to change the scope of the proposed work as the rehabilitation project progresses, Part 2 may be amended as the work progresses.  After the rehabilitation work is completed, Part 3 requests a certification that the historic rehabilitation work has been completed and seeks issuance of the income tax credits.

Backes is the founder and CEO of Provident Realty Advisors (PRA), a company in the business of large-scale real estate projects.  PRA forms various partnerships and entities dedicated solely to each real estate project.  In 2013, PRA decided to purchase and rehabilitate the Texaco building and formed Rusk at San Jacinto Building Investors, LP, whose general partner is TX 1111, to purchase the building.  PRA also formed other entities to take advantage of the benefits offered under the federal program.  TX 1111 filed Part 2 of the application in the federal program in November 2012 and described the proposed work that included both work involving QREs and work that would not qualify for QREs.  Actual work on the project began in 2014.  As the work progressed, several amendments were made to Part 2 of TX 1111's federal program application.

In 2015, Texas began offering state tax credits through the Texas Historic Preservation Tax Program.[6]  Like its federal counterpart, the Texas program offered state tax credits in proportion to QREs incurred.  The tax credits are valued at twenty-five percent of the total QREs spent by a developer and are earned once the QREs are spent and the corresponding work is

---

[6]*See* TEX. TAX CODE ANN. §§ 171.901, 171.908 (Supp.); §§ 171.902–.907, 171.909.  Although the program began in 2015, tax credits may be available "for eligible costs and expenses incurred in the certified rehabilitation of a certified historic structure" for any such structure placed in service on or after September 1, 2013.  TEX. TAX CODE ANN. §§ 171.903(1).

4

performed. Once received, the tax credits could be monetized by virtue of being sold to interested investors on the open market. Like the federal program, the tax credits were a source of capital for the rehabilitation project because they could be transferred under certain conditions for cash value, i.e., monetized, and were therefore a material part of the capital structure for the rehabilitation project. The Texas program's application consists of Parts A, B, and C, which correspond to the federal program's Parts 1, 2, and 3. In the Texas program, Parts A, B, and C must be approved by the Texas Historical Commission (THC).

Rusk at San Jacinto also sought to participate in the Texas program to help fund the Texaco building project. Once received, the state tax credits would be allocated to TX 1111. TX 1111 would then monetize the tax credits by selling them to Stonehenge Capital Co., a tax credit investor, through an affiliated entity, Rusk Investor, LLC. Rusk Investor's cash payments for the state tax credits were referred to as either "contributions" or "capital contributions" (hereinafter Contributions). TX 1111 filed its original Part B in the Texas program on August 25, 2015, which matched its federal program Part 2 as it existed at that time. At that time, the Texas program was set up as a single rehabilitation project.

Since TX 1111 would not receive the state tax credits or the Contributions until completion of the historic rehabilitation, it sought a loan to assist funding the rehabilitation project until the state tax credits could be monetized. TX 1111 was referred to First NBC, a lender with significant experience in making tax credit loans and as a tax credit investor,[7] for the

---

[7]The loan officer at First NBC who originated the bridge loan, Robert Calloway, testified that, in his eleven years at First NBC, he had worked on approximately eighty different historic tax credit projects, including forty to fifty tax credit bridge loans.

loan. First NBC was willing to make the loan to TX 1111 for purposes of funding a portion of the rehabilitation and to "bridge" receipt of the Contributions, with the Contributions serving as collateral for the contemplated loan.

On August 28, 2015, First NBC and TX 1111 entered into the bridge loan and executed the following agreements: (1) a bridge loan agreement outlining the financing terms; (2) a bridge loan promissory note in the maximum principal amount of $20,000,000.00, containing the repayment terms; (3) a bridge loan security and pledge agreement providing First NBC with a security interest in the Contributions as its only collateral; and (4) an assignment of rights to capital contributions in which First NBC was assigned all of TX 1111's right, title, and interest in and to the Contributions. In conjunction with the bridge loan,[8] Backes signed the guaranty for the amounts due and owing under the bridge loan, up to $20,000,000.00.

The bridge loan agreement provided that the bridge loan was a nonrecourse obligation secured only by the bridge loan collateral, i.e., the Contributions,[9] and that the lender would enforce TX 1111's obligations under the bridge loan only against that collateral "and not against

---

[8]The bridge loan agreement provides that the "Bridge Loan Documents" include the bridge loan agreement, the note, the loan security and pledge agreement, the assignment of rights to capital contributions, and the guaranty.

[9]Bridge loan collateral was defined as the collateral described in the loan security and pledge agreement and the assignment of rights to capital contributions. The security and pledge agreement described the collateral as TX 1111's "right, title and interest to the tax credit equity proceeds or capital contributions related to the state historic rehabilitation tax credits in connection with the historic rehabilitation of that certain building generally located at 1111 Rusk Street, Houston, Texas," "including all present and future payments, distributions, proceeds, profits, income, compensation, property, assets, interests and rights due or to become due and payable to [TX 1111] in connection with the" same. The assignment of capital contributions described the collateral as all of TX 1111's right, title, and interest in and to the capital contributions that the state tax credit investor had agreed to make to TX 1111. It also provided that the state tax credit investor could pay the Contributions directly to First NBC when they were due.

6

[TX 1111] or any of [TX 1111's] directors or employees . . . unless a separate guaranty agreement [was] executed in favor of the Lender."[10]

In the guaranty agreement, Backes "unconditionally, absolutely and irrevocably guarantee[d] and promise[d]" to pay First NBC up to $20,000,000.00, or so much thereof as may be due and owing under the note or any of the other bridge loan documents together with interest and any other sums payable under those documents, along with any loss or damage incurred by First NBC as a result of a default by TX 1111. Section 10 of the guaranty provided:

> This Guaranty is a continuing guaranty of payment and not of collection and cannot be revoked by Guarantor and shall continue to be effective with respect to any indebtedness referenced in Section 1 hereof arising or created after any attempted revocation hereof.

The guaranty also contained a termination clause that provided:

> **Section 21. Termination.** Lender and Guarantor acknowledge and agree that any and all obligations of the Guarantor under this Guaranty shall terminate upon the construction and completion of the historic tax credit rehabilitation of that certain building generally located at 1111 Rusk Street in Houston, Texas.

The bridge loan note was due and payable in full on August 28, 2017.

By July 2016, the anticipated amount of QREs to be incurred on rehabilitating the Texaco building increased, which resulted in an expectancy of more state tax credits than anticipated when the bridge loan closed. TX 1111 provided updated and audited projections of QREs to First NBC and requested additional funding based on the availability of additional state tax credits to serve as collateral. Based on these projections, First NBC loaned TX 1111 an additional $10,000,000. On July 5, 2016, First NBC and TX 1111 entered into an Amended

---

[10]The note also provided that it was a nonrecourse note enforceable against TX 1111 only to the extent of its interest in the property securing the note, unless a separate guaranty in favor of the lender had been executed.

7

Bridge Loan Agreement to reflect the additional $10,000,000 extension of credit. An Amended Assignment Agreement was also executed to reflect TX 1111's assignment of increased Contributions it expected to receive for the state tax credits, as well as an indirect and contingent interest in contributions from the federal tax credit investor. Neither the note nor the security and pledge agreement were amended. Likewise, the guaranty was neither amended nor increased.

First NBC was closed by the Louisiana Office of Financial Institutions, and the Federal Deposit Insurance Corporation was appointed receiver and took possession of First NBC's assets on April 28, 2017. The bridge loan matured on August 28, 2017, and the principal balance of $30,000,000.00 became due and owing. Both TX 1111 and Backes failed and refused to pay the amounts owing on the note. On October 18, 2017, Osprin purchased the bridge loan as part of a loan pool being auctioned by the FDIC.

Also in 2017, Stonehenge had investors that needed state tax credits to be issued in 2017. To do so, TX 1111 obtained an advisory determination from NPS that allowed it to prepare a state Part C for QREs incurred in the rehabilitation of the Texaco building through December 31, 2016. This had the effect of dividing the Texaco building rehabilitation into two projects under the Texas program: the first for work done through December 31, 2016, and the second for work on and after January 1, 2017. Without the approval from NPS and THC, TX 1111 would have been allowed only a single submission of the state Part C upon the completion of the Texaco building rehabilitation in its entirety.

8

The THC approved the first Part C and certified that the work was completed on December 31, 2016, which allowed the Texas Comptroller of Accounts to approve state tax credits for that phase of the project. Stonehenge received the state tax credits related to the first project in October 2017. The Contributions generated by those tax credits totaled $23,605,580.00.

After negotiations to extend the maturity date of the bridge loan failed, Osprin filed this suit in April 2018. In response to the lawsuit, Rusk Investors interpleaded the $23,605,580.00 in Contributions into the registry of the court in July 2018. In October 2018, Osprin filed a motion for partial summary judgment to obtain a release of the interpleaded funds. After the motion was set for hearing, the parties submitted an agreed order to release those funds to Osprin. In accordance with the bridge loan agreement, Osprin applied those funds[11] as follows: (1) $290,462.35 to legal fees, costs, and other expenses; (2) $2,604,811.64 to interest; and (3) $20,927,919.06 to principal.

The rehabilitation of the Texaco building continued, and on August 10, 2018, the final certificate of occupation was issued by the City of Houston.[12] On April 2, 2019, a second Part B application was submitted to THC. That Part B covered subsequent work, as described in the federal application, that was not covered by the first Part B. The second Part C, for work performed between January 1, 2017, and August 10, 2018, was submitted to the THC on April 3,

---

[11]When Osprin received the intepleaded funds, the funds totaled $28,823,193.05, including accrued interest.

[12]Temporary certificates of occupation had been issued in December 2016 and in 2017, which allowed tenants to occupy various floors of the Texaco building.

9

2019. The THC issued its certificate approving the second Part C on September 23, 2019, and certified that the placed-in-service date was August 10, 2018.[13]

The state tax credits issued because of the approval of TX 1111's second Part C generated Contributions of $5,320,502.11. On October 11, 2019, the parties entered into a Rule 11 agreement whereby those funds were to be held in an interest-bearing account by an agreed third party until further order of the court.[14] After Osprin filed another motion for summary judgment and set it for hearing, TX 1111 consented to the transfer of the funds to Osprin, and Osprin received the funds on February 11, 2020. In accordance with the bridge loan agreement, Osprin applied those funds as follows: (1) $578,296.64 to legal fees, costs, and other expenses; (2) $511,951.20 to interest; and (3) $4,230,154.47 to principal. As of the date of trial, there was $4,841,926.47 in principal, and $181,008.46 in accrued interest owed on the bridge loan.

After a trial on the merits, the trial court entered its final order that Osprin take nothing on its claims against TX 1111 and Backes and entered a declaratory judgment that any and all obligations of Backes under the guaranty were terminated and discharged by virtue of completing the historic tax credit rehabilitation of the project; that Backes recover from Osprin his attorney fees and expenses after February 12, 2020, in the amount of $736,330.51; that Osprin recover from Backes its attorney fees and expenses from March 2018 through February 12, 2020, in the amount of $861,760.76; and that Backes recover his appellate attorney

---

[13]TX 1111 filed its federal Part 3 in April 2019, which showed a completion date of December 31, 2017. The QREs approved by the NPS for the federal Part 3 match the combined QREs of the two state Part Cs approved by the THC.

[14]Stonehenge and Rusk Investor had previously been dismissed from the lawsuit.

10

fees should Osprin file an unsuccessful appeal of the final judgment. After offset, the trial court entered a $125,430.25 judgment in favor of Osprin and against Backes.

**II.**     **The Trial Court Did Not Err in Rendering a Take-Nothing Judgment for Backes**

The central issue in this appeal is whether the trial court properly construed the guaranty, and, in particular, the guaranty's termination clause. The trial court entered findings of fact and conclusions of law and determined that the application of the termination clause was ambiguous and stated that it heard evidence of the circumstances surrounding the execution of the guaranty and the other documents executed in relation to the bridge loan to determine the parties' intent. The trial court concluded that the parties' intent was that Backes would be released and discharged of all of his obligations under the guaranty when the THC approved TX 1111's final application for state tax credits and the proceeds from the state tax credits were ready to be paid.

In its first, second, and fifth issues, Osprin contends that the trial court erred in entering a take-nothing judgement in favor of Backes, in determining that the termination clause was ambiguous, and in determining that the termination clause discharged Backes of his matured obligations. While we agree that the trial court erred in determining that the termination clause was ambiguous, we also agree with the trial court's conclusion that all of Backes's obligations under the guaranty were terminated when the conditions of the termination clause were met. Because this construction of the termination clause supports the take-nothing judgment of the trial court, and because the parties do not challenge the trial court's finding that the conditions of the termination clause were met, we will affirm the take-nothing judgment.

11

## A.    Standard of Review

"We construe contracts under a de novo standard of review." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019) (citing *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011)). "In construing a contract, we must look to the language of the parties' agreement." *Id.* (citing *Murphy Expl. & Prod. Co.–USA v. Adams*, 560 S.W.3d 105, 108 (Tex. 2018)). "We must give effect to the parties' intentions, as expressed in their agreement." *Id.* (citing *Murphy Expl.*, 560 S.W.3d at 108). "We will give a contract language its plain, grammatical meaning unless it 'would clearly defeat the parties' intentions.'" *Id.* (quoting *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)).

"If we determine that the contract's language can be given a certain or definite legal meaning or interpretation, then the contract is not ambiguous and we will construe it as a matter of law." *Id.* (quoting *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012)). "But if the contract contains two or more reasonable interpretations, the contract is ambiguous, creating a fact issue as to the parties' intent." *Id.* (citing *El Paso Field Servs.*, 389 S.W.3d at 806). "When a court determines that a contract is ambiguous, the meaning becomes a fact issue for the [the fact-finder] and extraneous evidence may be admitted to help determine the language's meaning." *Id.* at 480 (citing *Italian Cowboy Partners, Ltd. v. Prudential Ins. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011)). Although a trial court errs when it, as the fact-finder, considers extraneous evidence when construing an unambiguous contract rather than construing it as a matter of law, the error is harmless if the court nevertheless finds as it should have found. *See id.* (citing *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam)).

The rule against considering extraneous evidence in construing an unambiguous contract "does not, however, prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as 'an aid in the construction of the contract's language.'" *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018) (quoting *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1981)). "When construing an unambiguous instrument, we may consult facts and circumstances surrounding its execution to aid our interpretation." *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 690 (Tex. 2022) (citing *URI, Inc.*, 543 S.W.3d at 757). Nevertheless, "[w]e cannot employ surrounding facts and circumstances to make contract language say something it unambiguously does not or to determine 'that the parties probably meant, or could have meant, something other than what their agreement stated.'" *Id.* (quoting *URI, Inc.*, 543 S.W.3d at 757). "Rather, the 'facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else,' and they can only give contract language a meaning to which it is 'reasonably susceptible.'" *Id.* (quoting *URI, Inc.*, 543 S.W.3d at 765). "In other words, such evidence may not be 'used to add, alter, or change the contract's agreed-to terms.'" *Id.* (quoting *Barrow-Shaver*, 590 S.W.3d at 485 (citing *URI, Inc.*, 543 S.W.3d at 758)). Such extraneous evidence includes "consistent collateral agreements . . . between parties concerning the relationship of several distinct obligations between them." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 875 (Tex. 2010) (citing *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 34 (Tex. 1958)).

## B. Interpretation of the Termination Clause

Osprin complains that the trial court erred when it concluded that Backes was released and discharged from all of his obligations under the guaranty agreement when the conditions of the termination clause were fulfilled.[15] Osprin argues that the termination clause should be interpreted to mean that the fulfilled conditions only discharged and released future, executory obligations. Relying on cases in which a party exercised its right to terminate a contract, Osprin insists that terminating a contract only relieves the party of liability on defaults that occur after the termination date but does not discharge obligations that have arisen and matured before the termination date. *See Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 66 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 754 (5th Cir. 1996).[16]

---

[15]The trial court entered a conclusion of law that stated:

> Any and all of Backes's obligations as Guarantor under his Repayment Guaranty have terminated and been discharged pursuant to the Termination Clause because "construction and completion of the historic tax credit rehabilitation of the Texaco Building" was completed when THC approved the second Part C to the Texas application for State Tax Credits and thereafter the proceeds of the State Tax Credits were ready to be paid, which occurred on February 11, 2020. Guarantor guaranteed the payment of the collateral, as this was a nonrecourse loan, and when the collateral was paid the Guaranty terminated by its very terms.

This conclusion of law contains both a conclusion of law that "any and all of Backes's obligations as Guarantor under his Repayment Guaranty have terminated and been discharged pursuant to the Termination Clause" and a finding of fact that "'construction and completion of the historic tax credit rehabilitation of the Texaco Building' was completed when THC approved the second Part C to the Texas application for State Tax Credits and thereafter the proceeds of the State Tax Credits were ready to be paid, which occurred on February 11, 2020." Although Osprin challenges the conclusion of law, in the body of its brief, it does not challenge the fact-finding that the historic tax credit rehabilitation was completed when THC approved the second Part C and the state tax credits were ready to be paid.

[16]These cases are distinguishable. In *Gulf Liquids*, the termination clause provided that, if Gulf Liquids terminated the contract, whether with or without cause, Gulsby would be entitled to payment for work actually completed. *Gulf Liquids New River Project, LLC*, 356 S.W.3d at 65. The termination clause in this case has no such provision. Further, that case involved a party exercising its rights to terminate under the termination clause. In this case, the

14

However, nothing in the termination clause supports Osprin's interpretation. Rather, the plain language of the clause leads us to the opposite conclusion. The clause provides that "any and all obligations of the Guarantor under this Guaranty shall terminate upon the construction and completion of the historic tax credit rehabilitation" of the Texaco building. "Terminate" means "to bring to an end." *Terminate*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006); *Terminate*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Obligation" means "something (as a formal contract, a promise), that obligates one to a course of action," "a commitment . . . . to pay a particular sum of money; *also*: an amount owed under such an obligation," *Obligation*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2006), or "a duty arising by contract," *Obligation*, BLACK'S LAW DICTIONARY (11th ed. 2019). Under the plain language of the termination clause, upon the completion of the tax credit rehabilitation of the Texaco building, any and all of the actions Backes bound himself to perform under the guaranty, including his commitment to pay a particular sum of money and the amount owed under such commitment, were brought to an end.

Osprin argues that, because Backes's obligations matured when TX 1111 failed to pay the note at maturity, those obligations became fixed and were not terminated when the tax credit rehabilitation was completed. Yet, the termination clause specifically referred to the guarantor's obligations under the guaranty. The guaranty refers to two primary obligations of the guarantor.

termination of Backes's obligations resulted from the occurrence of a specific event, not by Backes exercising his rights under the guaranty. In *Sid Richardson*, in commenting on the parties' arguments as to whether the parties' settlement agreement that terminated all agreements between the parties retroactively extinguished vested rights, the court merely noted that a section of the Texas Business & Commerce Code that is applicable only to sales contracts defines "termination" as a prospective remedy. *Sid Richardson Carbon & Gasoline Co.*, 99 F.3d at 754 (citing TEX. BUS. & COM. CODE ANN. § 2.106(c)). The court did not make any determination of whether, under the settlement agreement, vested interests were retroactively extinguished. *Id.*

15

Section 1 sets forth the "Guaranteed Obligations," which are defined as "to pay Lender on order or demand . . . . an amount not to exceed [$20,000,000.00] or so much thereof as may be due and owing under the Note or any of the other Bridge Loan documents." Section 2 sets forth the "Obligations of Guarantor upon Default by Borrower," which are, upon default by the borrower, to pay the lender promptly upon demand the amount of any loss or damage actually incurred by lender as a result of the default, including "all outstanding principal and accrued interest."[17] Significantly, Backes's obligations under those two sections are not activated until the borrower defaults on the bridge loan note, whether by failure to pay the note in full upon maturity or by some other event of default, at which point, according to Osprin, they become matured and fixed.

Thus, under Osprin's interpretation the termination clause only applies before there is a default by the borrower and ceases to apply to the two primary obligations at the moment those obligations are activated. Yet, the termination clause provides that *any and all* of Backes's obligations under the guaranty shall terminate and does not limit the scope of the obligations or except any obligations, whether mature or not. Further, the termination clause provides that termination occurs when the tax credit rehabilitation is completed, again with no limitation that the completion must be accomplished before the note matures or before default by the borrower.

Essentially, Osprin asks us to change the wording used by the parties to the guaranty by adding qualifying language to its broad scope, such as: "any and all obligations of the Guarantor under this Guaranty, *except those obligations that are matured, fixed, and non-executory*, shall

---

[17]Section 3 provides that the guarantor's obligations are primary and independent of the borrower's and allows the lender to bring a separate action against the guarantor. Section 4 provides that the remedy for lender is to "bring an action . . . to compel Guarantor to perform its obligations . . ., and to collect in any such action compensation for all loss, cost, damage, injury and expense actually sustained or incurred by Lender" because of the guarantor's failure to perform its obligations.

16

terminate upon the construction and completion of the historic tax credit rehabilitation [of the Texaco building]"; or, alternatively, "any and all obligations of the Guarantor under this Guaranty shall terminate upon the construction and completion of the historic tax credit rehabilitation [of the Texaco building], *provided such construction and completion occurs before any default by borrower*." However, when a clause is clear and enforceable based on its terms, as in this case, we "'cannot rewrite the parties' contract or add to or subtract from its language." *URI, Inc.*, 543 S.W.3d at 770 (quoting *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 242 (Tex. 2016)).

The surrounding facts and circumstances support our conclusion that the parties intended that all of Backes's obligations under the guaranty would come to an end once the historic tax credit rehabilitation of the Texaco building was completed. The evidence showed that First NBC and Backes were sophisticated parties with extensive experience in the funding of historic tax credit rehabilitation projects, including tax credit bridge loans. Both parties were represented by counsel in an arms-length transaction. The bridge loan documents, including the guaranty, were prepared by First NBC's attorney after negotiations between the parties and their attorneys. Consequently, the surrounding circumstances show that the termination clause in the guaranty was a bargained-for exchange between the parties and clearly expressed their intent. *See Barrow-Shaver*, 590 S.W.3d at 484.

For these reasons, we find that the plain language of the termination clause, containing an all-embracing termination of any and all of Backes's obligations under the guaranty, shows the parties' clear intent that completion of the historic tax credit rehabilitation of the Texaco building

17

would bring an end to Backes's obligations under the guaranty, including those that had matured. *See Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, No. 20-0932, 2022 WL 1275238, at *7 (Tex. Apr. 29, 2022); *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 58 (Tex. 2008). Because we find that the termination clause was not ambiguous, we also find that the trial court erred to the extent that it considered extraneous evidence, other than extrinsic evidence of the facts and circumstances surrounding the execution of the bridge loan document, to determine the parties' intent. *See Barrow-Shaver*, 590 S.W.3d 480, 483–84. Nevertheless, since the trial court's construction of the termination clause was correct, any such error was harmless. *See id.* at 480.

Because, under the termination clause, all of Backes's obligations under the guaranty terminated upon the completion of the historic tax credit rehabilitation of the Texaco building, and because the trial court entered an unchallenged fact-finding establishing when the completion occurred that was supported by evidence at trial,[18] we find that the trial court did not err in entering a take-nothing judgment in favor of Backes. We overrule Osprin's first, second, and fifth issues.[19]

## III.    The Trial Court's Award of Attorney Fees and Expenses

The trial court found that, under the Uniform Declaratory Judgment Act, it was equitable and just to award Backes his reasonable attorney fees and expenses incurred after February 12, 2020, and to award Osprin its reasonable attorney fees and expenses incurred from March 2017,

---

[18]"Unchallenged findings of fact bind the appellate court unless the contrary is established as a matter of law or no evidence supports the finding." *Weltch v. Estate of Weltch*, No. 14-20-00113-CV, 2021 WL 6141184, at *3 (Tex. App.—Houston [14th Dist.] Dec. 30, 2021, no pet.) (mem. op.) (citing *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986)).

[19]Because the resolution of these issues is sufficient to support the trial court's take-nothing judgment in favor of Backes, we need not address Osprin's third, fourth, and sixth issues that challenge the judgment on other grounds.

18

through February 12, 2020.[20]  In its seventh and eighth issues, Osprin asserts that the trial court erred in awarding any attorney fees and expenses to Backes and that it erred in not awarding Osprin its attorney fees and expenses incurred after February 12, 2020.[21]  Osprin's sole basis for challenging the trial court's award of attorney fees and expenses is its contention that the trial court erred in its construction of the guaranty agreement.  Because we have determined that the trial court did not err in its determination that, under the termination clause, all of Backes's obligations under the guaranty terminated upon the completion of the historic tax credit rehabilitation of the Texaco building, we overrule these issues.

## IV.    No Entitlement to Attorney Fees Against TX 1111

In a separate issue, Osprin contends that the trial court erred in not awarding its attorney fees and expenses against TX 1111.  Osprin makes two arguments in support of this contention.  First, Osprin argues that TX 1111 is liable for Osprin's attorney fees and expenses under the indemnity clause contained in the amended assignment of rights to capital contributions because Osprin recovered the capital contributions through litigation, and TX 1111 failed to cooperate in the recovery of the contributions.

The amended assignment's indemnity clause provides:

[TX 1111] will indemnify [First NBC] against and hold [First NBC] free and harmless from any and all claims, demands, lawsuits, judgments, awards, costs and expenses, including, but not limited to, reasonable attorney fees, arising by reason of any loss or impairment of the availability of the Contributions pursuant to the Borrower Operating Agreement, except to the extent such claims, demands,

<hr>

[20]This date appears to be based on the trial court's finding that the historic tax credit rehabilitation of the Texaco building was completed and that, consequently, all of Backes's obligations under the guaranty terminated on February 11, 2020.

[21]Neither Osprin nor Backes challenge the applicability of the UDJA in this case.

> lawsuits, judgments, awards, costs and expenses have been incurred due to the negligent or willful misconduct of Assignee.

Generally, "[a]n indemnity provision does not apply to claims between the parties to the agreement; instead, it obligates the indemnitor to protect the indemnitee against claims brought by a person not a party to the agreement." *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 20 S.W.3d 119, 130 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing *Wallerstein v. Spirt*, 8 S.W.3d 774, 780 (Tex. App.—Austin 1999, no pet.); *Derr Const. Co. v. City of Houston*, 846 S.W.2d 854, 858 (Tex. App.—Houston [14th Dist.] 1992, no writ)). Nevertheless, an indemnity provision may be written such that the parties "agree to indemnify one another against claims they later assert against each other." *Claybar v. Samson Expl., LLC*, No. 09-16-00435-CV, 2018 WL 651258, at *2 (Tex. App.—Beaumont Feb. 1, 2018, pet. denied) (mem. op.) (citing *Ganske v. Spence*, 129 S.W.3d 701, 708 (Tex. App.—Waco 2004, no pet.)). However, in order to show "that an indemnity provision applies, the plaintiff must show that a third party has filed a claim against him or that the indemnity agreement contains language indicating that it applies to claims between the parties." *Id.* (citing *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 63 (Tex. App.—San Antonio 2005, pet. denied); *Ganske*, 129 S.W.3d at 708; *Coastal Transp. Co.*, 20 S.W.3d at 130).

The plain language of the indemnity provision does not show that the parties intended for TX 1111 to indemnify First NBC or its successor-in-interest, Osprin, for defending against claims filed by Osprin against TX 1111. If TX 1111 and First NBC "had intended to include claims between them, they would have had to specifically add such language" to the indemnity provision. *Id.* at *3 (citing *Ganske*, 129 S.W.3d at 708). Since the indemnity provision lacks

any specific language that would overcome the general rule that indemnity provisions do not apply to claims between the parties, Osprin has not shown that the indemnity provision is applicable to its claims. *See id.*; *see also Nat'l City Mortg. Co. v. Adams*, 310 S.W.3d 139, 143–44 (Tex. App.—Fort Worth 2010, no pet.); *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 63 (Tex. App.—San Antonio 2005, pet. denied).

Osprin also argues that, because the trial court awarded it attorney fees, costs, and expenses against Backes for the period from March 2018 through February 12, 2020, the trial court should have awarded it the same fees, costs, and expenses against TX 1111 on the same grounds. Osprin points to the trial court's findings of fact regarding TX 1111's opposition to Osprin's entitlement to the Contributions during the course of the litigation. The trial court awarded Osprin its reasonable attorney fees, costs, and expenses against Backes through February 12, 2020, pursuant to the Uniform Declaratory Judgment Act.

We review a trial court's award of attorney fees under the UDJA for an abuse of discretion. *See Nabers v. Nabers*, No. 14-18-00968-CV, 2020 WL 830025, at \*2 (Tex. App.—Houston [14th Dist.] Feb. 20, 2020, no pet.) (mem. op.). Under the UDJA, "reasonable and necessary attorney's fees" may be awarded if they "are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. "Trial courts have wide discretion in determining what is equitable and just in awarding attorney's fees, and appellate courts will not overturn such a decision unless it is clear from the facts the trial court abused its discretion." *Nabers*, 2020 WL 830025, at \*2 (citing *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998)). "The trial court abuses its

discretion if it acts in an arbitrary or unreasonable manner." *Id.* (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam)).[22]

"The trial court's conclusion regarding an equitable and just fee award is based on all the circumstances of the case." *Id.* (citing *Carpenter v. Carpenter*, No. 02-10-00243-CV, 2011 WL 5118802, at *5–6 (Tex. App.—Fort Worth Oct. 27, 2011, pet. denied) (mem. op.)). "In the exercise of its discretion, . . . the trial court may award attorney's fees to the prevailing party, may decline to award attorney's fees to either party, or may award attorney's fees to the non-prevailing party, regardless of which party sought declaratory judgment." *Id.* (citing *Ochoa v. Craig*, 262 S.W.3d 29, 33 (Tex. App.—Dallas 2008, pet. denied)).

In this case, Osprin sued Backes to enforce the guaranty after Backes refused to pay the sums owed under the bridge loan after TX 1111 defaulted. Backes filed counterclaims under the UDJA asking, among other things, that the trial court declare that Backes's obligations under the guaranty agreement were discharged upon Osprin's receipt of the $23,823,193.05 in Contributions generated by the state tax credits related to the first state rehabilitation project. However, the trial court determined that Backes's obligations did not terminate until Osprin also received the Contributions generated by the state tax credits related to the second state

---

[22]Initially, we note that a "trial court need only enter findings . . . on ultimate or controlling issues." *In re Marriage of Grossnickle*, 115 S.W.3d 238, 253 (Tex. App.—Texarkana 2003, no pet.). "An ultimate fact issue is 'one that is essential to the cause of action and has a direct effect on the judgment.'" *Wood v. Wiggins*, No. 01-18-00630-CV, 2021 WL 5312652, at *21 (Tex. App.—Houston [1st Dist.] Nov. 16, 2021, pet. filed) (quoting *Cooke Cnty. Tax Appraisal Dist. v. Teel*, 129 S.W.3d 724, 731 (Tex. App.—Fort Worth 2004, no pet.)). "An evidentiary issue is one the court may consider in deciding the controlling issue but is not controlling in and of itself." *Id.* (citing *Cooke Cnty.*, 129 S.W.3d at 731). "We may only reverse the trial court's judgment if the court made an erroneous finding on an ultimate fact issue; immaterial findings are harmless and are not grounds for reversal." *Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 822 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) (citing *Castro v. Castro*, No. 14-11-01087-CV, 2013 WL 1928742, at *5 (Tex. App.—Houston [14th Dist.] May 9, 2013, no pet.) (mem. op.)). The trial court's findings related to TX 1111's actions during the course of the litigation were evidentiary, were immaterial to the trial court's judgment, and consequently, were not grounds for reversal.

rehabilitation project, which occurred on February 11, 2020.  Since Osprin partially prevailed in its defense of Backes's UDJA claims and recovered the Contributions through the litigation, the trial court in its discretion awarded it attorney fees, costs, and expenses against Backes.

In contrast, Osprin filed suit against TX 1111 and alleged that TX 1111 had breached its representations, covenants, and warranties under the assignment of rights to capital contributions. Further, although Osprin filed a UDJA claim against TX 1111, it only asked that the trial court declare that Osprin was entitled to a perfected security interest in the Contributions and that TX 1111's statement regarding the value of the Contributions did not impair its right to recover the full value of its perfected security interest in the Contributions.  As to these claims, Osprin later asserted that it was undisputed that it held a perfected security interest in the Contributions, and the trial court never made a finding regarding the second requested declaration.  Regarding the other claims asserted against TX 1111, the trial court found that TX 1111 did not breach any of its representations, covenants, and warranties under the bridge loan documents and the amended bridge loan documents.

Considering all the circumstances of the case, we cannot say that it is clear from the facts that the trial court abused its discretion in failing to award Osprin attorney fees against TX 1111 under the UDJA.  *See Nabers*, 2020 WL 830025, at *2.  For these reasons, we overrule this issue.

23

## V.    Backes's Cross-Appeal

Backes's sole issue in his cross-appeal complains that the trial court abused its discretion in awarding attorney fees to Osprin.[23]  Backes argues that, under the bridge loan documents, Osprin was required to apply any realization of its collateral first to attorney fees.[24]  Backes reasons that, since Osprin realized all of the Contributions and was required to apply that first to attorney fees, the trial court's award of attorney fees was a misapplication of the law applicable to the case and amounted to a double recovery of the attorney fees.

Backes focuses only on Osprin's argument in the trial court claiming its entitlement to attorney fees under the guaranty agreement.  However, Osprin also argued that it was entitled to attorney fees under the UDJA.  And as noted above, the trial court awarded Osprin attorney fees under the UDJA, not under the guaranty agreement.

In addition, at trial, Osprin segregated its attorney fees, costs, and expenses incurred in the realization of the Contributions from those incurred in prosecuting its other claims against TX 1111 and Backes.[25]  Those attorney fees, costs, and expenses totaled over $1.1 million, of which the trial court only awarded those incurred from March 2018 through February 12, 2020.

---

[23]As previously noted, the trial court awarded Osprin its attorney fees and expenses from March 2018 through February 12, 2020, (the date it received the Contributions related to the second state rehabilitation project) in the amount of $861,760.76.

[24]Under the bridge loan agreement, "[T]he proceeds of any sale of, or other realization upon, all or any part of the Bridge Loan Collateral . . . shall be applied by Lender. . . first, to payment of the expenses of such sale or other realization, including reasonable compensation to agents and counsel for Lender, and all expenses . . . actually incurred . . . by Lender in connection therewith."  The officer servicing the loan testified that Osprin applied $290,462.35 to legal fees, costs, and other expenses incurred in recovering the Contributions related to the first state project, and $578,296.44 to legal fees, costs, and other expenses incurred in recovering the Contributions related to the second state project.

[25]Backes does not complain about the failure to segregate attorney fees between claims asserted against TX 1111 and claims asserted against Backes.

As a result, we find that the trial court's award of attorney fees to Osprin did not result in a double recovery and that the trial court did not abuse its discretion in awarding the fees under the UDJA. We overrule Backes's sole issue.

## VI. Conclusion

For the reasons stated, we affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:     April 11, 2022
Date Decided:       July 8, 2022